## Commonwealth *versus* Mayloy and Keating.

## Commonwealth *ex rel.* Mayloy and Keating *versus* The Keeper of Philadelphia County Prison.

|57|291|
|---|---|
|135|93|

| 57 | 291 |
| 38SC | 10200 |

| 57 | 291 |
| 41SC 7 | 32 |

1. It is the duty of courts to hear and determine according to law; beyond this the only express power to interfere in regard to convicts is the pardoning power exclusively in the hands of the executive.

2. In the exercise of judicial power there are many things inherent in the courts and exercisable without having been conferred by statute, necessarily resulting from their own rules and uniform practice.

3. Practice is the form, manner and order of conducting and carrying out suits or prosecutions in the courts through their various stages according to the principles of law and the rules laid down by the respective courts.

4. A custom to have the effect of law must have its origin from " time whereof the memory of man runneth not to the contrary."

5. The practice of courts may be established without written rules as its foundation, in some cases in a shorter period.

6. Customs become law from immemorial and universal acquiescence either in a neighborhood or in the entire community to be affected.

7. The criminal courts of this state have not power when sentence is passed

[Commonwealth *v.* Mayloy.]

to enter a rule to reconsider their judgment and at a subsequent term alter the sentence.

8. Prisoners tried within the last four days of the term, cannot be deprived of their legal right to the allotted period to prepare and make their motion for a new trial. If the term ends too soon for this, motions may be made within an allotted period after the commencement of the succeeding term.

9. The court has power to remand and hold convicts for sentence as long as may be deemed necessary and advantageous to the ends of justice, and in the mean time may receive additional information as to what should be an appropriate sentence, where the court has discretion.

10. The convict has no right to be heard by the judge or court after sentence, especially after the term. He must resort to the executive.

February 19th and 21st 1868. Before THOMPSON, C. J., STRONG, READ, AGNEW and SHARSWOOD, JJ.

Error to the Court of Quarter Sessions of *Philadelphia*: No. 307, to January Term 1868.

At the July sessions (1867) of the Court of Quarter Sessions of Philadelphia, Joseph Mayloy and James Keating were convicted of larceny, and on the 15th day of July 1867 they were sentenced each to pay a fine of one cent, and undergo imprisonment in the Philadelphia county prison for twelve months, pay the costs of prosecution, and stand committed till the judgment be fully complied with. Before the expiration of that term, the court, of its own motion, entered a rule to reconsider the sentence. This was done in accordance with a custom which had obtained there. The governor of the Commonwealth, in his message to the legislature, on the 8th of January 1868, referred to this custom as of doubtful authority.

In his charge to the grand jury of the Court of Quarter Sessions, January 16th 1868, Allison, P. J., spoke of the governor's message on this point and said:—

"Feeling satisfied that courts have the right to exercise the power of reconsideration of sentences, in cases in which rules to reconsider the same had been entered at the term at which sentence was imposed, we are ready to make a case now on which the governor can instruct the attorney-general to have the question speedily settled by the Supreme Court. At the last July session, held by Judge Peirce, Joseph Mayloy and James Keating pleaded guilty to the charge of larceny, and were sentenced to twelve months' imprisonment in the county prison.

"At the term a rule was entered by my brother Peirce, which he has determined to make absolute, so that the term of imprisonment shall expire on the 1st proximo. The court now disposes of the rule by ordering it to be made absolute, so that the term of imprisonment will expire upon the 1st of February next."

The prisoners were accordingly brought into court on the 20th of January 1868, and then sentenced each to pay a fine of one cent, and undergo an imprisonment, &c., in the Philadelphia

[Commonwealth v. Mayloy.]

county prison for six months and seventeen days, from July 15th 1867, pay the costs, &c.

The Commonwealth therefore took a writ of error, and assigned for error—

1. Vacating, altering and reimposing sentence on the defendants on January 20th 1868, after the term at which final judgment and sentence were had, execution ordered and sufferance of the execution begun.

2. Entering the rule to reconsider the original sentence, to lie over after the term, and making said rule absolute after the term.

After the expiration of the term of their sentence, as pronounced January 20th 1868, Mayloy and Keating presented a petition to the Supreme Court, setting out the foregoing facts, and praying for a writ of habeas corpus. The writ was awarded February 6th 1868.

The writ of error and habeas corpus were argued together.

*G. L. Crawford* and *Brewster*, Attorney-General, for the Commonwealth.—Records are a finality: 3 Bl. Com. 275–408, *et seq.* Fixed terms are necessary to the successful administration of justice: Horton *v.* Miller, 2 Wright 270. English statutes conferring power to amend extend only to cases mentioned in the statutes, as 9 Geo. 4, c. 15; 3 Bl. Com. 407, Chitty's note; 11 & 12 Vict. c. 46; 12 & 13 Vict. c. 45; 14 & 15 Vict. c. 100; 4 Bl. Com. 375, 376, Stewart's note. See Roberts's Dig. tit. *Amendment.* Judgments may be altered or amended during the term, but not after: 2 Bac. Abr. 477; 4 Com. Dig. 702; 7 Id. 208; Hawk. P. C. book 2, c. 48, § 20; 3 Thomas Coke 351; Coke Litt. 260; 1 Chit. Cr. L. 722; Reg. *v.* Fitzgerald, 1 Salk. 401; Inhabitants of St. Andrews, Holborn, &c., 2 Salk. 607; Rex *v.* Walcot, Comb. 369; McClelland 251; Prince *v.* Nicholson, 1 Marshall 401; 6 Taunt. 45; Rex *v.* Stevens, 3 Sm. 366; Fletcher's Case, Russ. & Ry. 70; Rex *v.* Wingfield, Cro. Car. 251; T. Raym. 377; Bowers *v.* Nixon, 12 Ad. & El. N. S. 556; King *v.* Price, 6 East 327; King *v.* Justices, 1 M. & S. 444; Darling *v.* Gurney, 2 Dowl. Pr. Cas. 101; Wentworth *v.* Strafford, 5 Mod. 148; Reg. *v.* Hewins, 9 C. & P. 789; Stephens's Cr. L. 224–232.

Pardon can be granted by the Executive alone: 4 Bl. Com. 397; 2 Wilson's Lect.; § 197; Penn's Charter, § 2; Const. of Sept. 28th 1776, § 20, 5 Sm. L. 428; Const. of 1790, 1838, 1857, Art. 2, § 9, Purd. 17; Morris *v.* Vanderen, 1 Dall. 67; Resp. *v.* Mesca, Id. 74. The common law of England is in force here. The power of criminal courts over their records ends with their terms: Acts of May 31st 1718, §§ 6, 26, 28, 1 Sm. L. p. 111, *et seq.;* May 22d 1722, §§ 2, 4, 6, Id. 131, *et seq.;* January 28th 1777, §§ 2, 4, Id. 429, 430; March 11th 1789, §§ 19, 20, 2 Id. 462; April 13th 1791, § 4, 3 Id. 29; March 17th 1799, Id. 358;

[Commonwealth *v.* Mayloy.]

February 24th 1806, §§ 12, 14, 26, 4 Id. 273; April 14th 1834, §§ 46, 67, Pamph. L. 350; February 3d 1843, §§ 3, 4, Pamph. L. 8, Purd. 828, 831, pl. 5, 30, 32; February 8th 1848, Pamph. L. 25; April 22d 1850, § 12, Pamph. L. 545; March 13th 1867, Pamph. L. 420; April 4th 1807, § 2, 4 Sm. L. 393; April 23d 1829, Pamph. L. 250, 252; June 16th 1836, § 1, Pamph. L. 785, Purd. 928, pl. 19. Even in civil cases the power of the court to amend after the term is circumscribed: Catlin *v.* Robinson, 2 Watts 379–380; Stephens *v.* Cowan, 6 Id. 513; Ullery *v.* Clark, 6 Harris 149; Smith *v.* Hood, 1 Casey 218; Mathers *v.* Patterson, 9 Id. 485; Beale *v.* Commonwealth, 1 Id. 11; 1 Bishop Cr. Pro. 875–877; State *v.* Burnett, 1 Dev. & Batt. 43; Jobe *v.* State, 28 Ga. 235; People *v.* Thompson, 1 Cal. 242; In re Mason, 8 Mich. 70; People *v.* Duffy, 51 Barb. 205; Commonwealth *v.* Weymouth, 2 Allen 144; Miller *v.* Finkle, 1 Parker's Crim. Law 374; King *v.* Price, 6 East R. 322; King *v.* Justices of Leicestershire, 1 Maule & S. 442; 1 Chitt. Cr. L. 722; Albers *v.* Whitney, 1 Story 312; Smith *v.* Jackson, 1 P. C. C. R. 458; Brush *v.* Robbins, 3 McLean 486. Local particular customs are not recognised in Pennsylvania: Stoever *v.* Whitman, 6 Binn. 416; Gordon *v.* Little, 8 S. & R. 559; King *v.* Bourne, 7 Ad. & El. 58. The Attorney-General appended to his paper-book letters from president judges of many of the judicial districts, stating that the practice of reconsidering sentences after the term did not prevail in their districts.

*J. O'Byrne* and *Meredith* (with whom was *C. H. T. Collis*), for defendants and error and relators.—It must be conceded that the court could reconsider its sentence at the term at which it was passed: Muller *v.* Finkle, 1 Parker's Crim. Rep. 374; King *v.* Price, 6 East 322; Commonwealth *v.* Weymouth, 2 Allen (Mass.) 144; Rex *v.* Wm. Wyatt, 1 Russ. & Ry. 229; Commonwealth *v.* Tilghman, 4 S. & R. 127. Having entered the rule at that term, it could be acted on at any subsequent term: 2 Hawk. c. 31, § 8; 2 Hale Pl. of the Crown, c. 58, Crompton, J., 22 b; 2 Dyer 205; Rex *v.* Fletcher, 1 Russ. & Ry. 59; Keen *v.* Queen, 10 Ad. & El. N. S. 927 (59 E. C. L.); Queen *v.* Belton, 11 Id. 389 (63 E. C. L.); Rex *v.* Justices of Wiltshire, 13 East 352; Bowman *v.* Blyth, 40 E. L. & E. 139; Act of February 3d 1843, § 4, Pamph. L. 8, Purd. 831, pl. 32; Commonwealth *v.* Halloway, 6 Wright 446; Baily *v.* Musgrave, 2 S. & R. 220; Catlin *v.* Robinson, 2 Watts 373; Blakey *v.* Birmingham, 2. Strange 1132; Kalbach *v.* Fisher, 1 Rawle 323; Bartholomew *v.* Carter, 3 Man. & Gr. 129; State *v.* Bennett, 4 D. & B. 43 (N. C.); Stephens *v.* Stephens, cited in note to 1 Tr. & Haley 864; Rhoads *v.* Commonwealth, 3 Harris 276; Vernon *v.* Hankey, 2 T. R. 120. That a judgment could not be reconsidered after the term was not a

[Commonwealth v. Mayloy.]

principle of the common law. It arose in the corruption of Tressylian and other judges, who brought up records, and was brought about to prevent "rasing the records." Every judgment is "nisi." Recognisances are judgments of a court, having all the elements of final judgment except form. Courts can remit them at a subsequent term, and thus refuse to execute their judgments. In England every felony had its appropriate punishment; here we put in the discretion of the court every crime except murder in the first degree—there is no minimum of punishment. Look at the right of the thing; every crime to be punished at the discretion of one judge. Whenever the punishment is at discretion, the convict has a *right* to present his case to the judge by affidavits.

The opinion of the court was delivered, February 27th 1868, by THOMPSON, C. J.—The habeas corpus issued at the instance of the relators, Mayloy and Keating, will be determinable conclusively by the result of our judgment in the writ of error sued out by the Commonwealth, which brought up the record of their conviction and sentence to imprisonment for larceny, in the county prison. This being apparent, it was agreed by the counsel for the prisoners to argue both cases together, which having been done, they will now be considered and disposed of together.

The single question to be decided is as to the power of the criminal courts of this county to reconsider a sentence, after the term at which it was pronounced, and during the progress of its execution, and to modify or diminish its extent, the rule for which being entered at the time of sentence, and within the term.

In the case before us, sentence was pronounced upon the prisoners on the 15th of July 1867, to undergo an imprisonment of one year in the county prison, and to pay a nominal fine and costs; and they were immediately committed in pursuance of the sentence. On the same day a rule was entered at the instance of the court "to show cause why the sentence in this case should not be reconsidered." To this rule no return day was assigned. Afterwards, on January 16th 1868, the docket entry reads, "rule absolute;" and, on January 20th 1868, the prisoners, as the record informs us, were brought again before the court and resentenced to pay a nominal fine and undergo an imprisonment in the county prison, for the term of six calendar months and seventeen days each, to be computed from the date of the original sentence, viz., 15th July 1867, and to pay the costs of prosecution, &c. This operated to remit five months and thirteen days of the original sentence, and left the prisoners fourteen days to serve after sentence. Could this be done by law?

It was alleged in argument that there was a practice of long

[Commonwealth *v.* Mayloy.]

standing in Philadelphia to sanction this proceeding. Its validity being questioned, and the learned judges of the court being desirous of having the matter definitely settled, took the first opportunity to present a case which might fully test the matter, and made the rule absolute in the cases of these relators. This was highly proper and commendable, as they were not the authors of the alleged practice.

In treating the question thus presented, it is not intended to encumber our opinion with a review of every point suggested and dilated on in argument. This would not be possible within the compass of an opinion of reasonable length. It is neither necessary to the requirements of the case, nor beneficial to the law.

The first remark which may be made is, that the power exercised is not to be found based on any express authority constitutional or statutory; nor in any express right of the convicts to its exercise. Courts are founded on express authority; and their duty is to hear and determine according to law. Beyond this the only express power to interfere in regard to convicts, is the pardoning power, exclusively in the hands of the executive. Of course, in the exercise of judicial power, there are many things inherent in the courts and exercisable by them, without having been conferred by statute, but which necessarily result from their own rules and uniform practice. But practice is defined to be the " form, manner and order of conducting and carrying out suits or prosecutions in the courts, through their various stages, according to the principles of law and the rules laid down by the respective courts:" Bouv. L. Dic., tit. *Practice.* It is an auxiliary but no more. As a matter of practice, if this definition be sound, and I do not doubt it, the exercise of the power claimed must stand on higher grounds than a mere auxiliary or rule of practice. Is it an inherent common-law power, or a customary power? These questions we will proceed to examine and answer, if possible.

Its exercise has been compared with the allowances in England of the ancient and now obsolete plea or claim of benefit of clergy, which it is said, and truly, was allowed after judgment, as well as before, and even under the gallows, if the judge who passed the sentence happened to pass by. But this was the law of the privilege, and from it there is no case which shows that an inherent power has grown up in the courts to interfere with criminal sentences after the term when the record has ceased to be in the breast of the court, and has become a solemn matter on record. That which has also been suggested as giving countenance to the existence of such a power, is the exercise by the judges in England, of the power to respite the execution of capital sentences, and in some circumstances, sentences of transportation. As to the power, their rule differs materially from ours. There the time of execution is fixed by the judge, and is part of the sentence: 4 Blac. Com.

[Commonwealth v. Mayloy.]

357, app. II., and it is allowable to the judge to respite it for a time. With us the judge does not fix a time for execution. The governor does that in the death-warrant. The practice to respite is therefore, not possible here.

So in regard to the sentence of transportation. There, as I understand it, the time of execution is also fixed by the judge and may be respited. This is no part of our system—no such punishment exists with us, and we can deduce no such rule as is claimed on this authority, or from either of such precedents. Indeed, the common-law principle, of the finality of judgments, is at once an answer to the argument, and a refutation of the idea, that the power to interpose exists after the term has passed.

This principle of finality is sufficiently apparent in our own reports, without the necessity of research. "There must be a time," it was said by our brother Strong in Mathers v. Patterson, 9 Casey 485, "when the power of a court to open its judgments, obtained adversely, ceases. In England it ends with the term at which the judgment is signed. True, there is a reason for this which does not exist with us, arising from the peculiar manner in which the records are there made up and kept; but the rule of the English courts would seem to have been recognised as existing here: Catlin v. Robinson, 2 Watts 379; Stephens v. Cowan, 6 Id. 513." The finality of criminal judgments there rests not on identity of practice, although it does on principle. In The Commonwealth v. Beale, 1 Casey 11, the power to interfere after the term, was positively denied by this court, in an opinion by Woodward, J. The numerous authorities cited by the attorney-general and his colleague, English and American, which I need not notice more specially, establish the rule beyond a doubt. In fact, as suggested from the bench on the argument, the finality of the sentence might be a most material thing to the rights of the convict; for if he should desire to sue out a writ of error, a rule to reconsider existing might stand greatly in his way—a final judgment not appearing on the record.

But it has been argued, that the rule to reconsider within the term, is a modification ipso facto, of the rule which regards the finality of the sentence. The difficulty is to find authority for the rule. A principle is often limited in its scope by other principles, and when so the operation is the result of law. But it is quite another thing to make a rule to control a principle. This is legislation. To go the extent of the argument would be to set aside the maxims of the law in regard to the finality of judgments and sentences—"Interest reipublicæ res judicata non rescindi," and "res judicata veritate accipitur."

Every portion of the proceedings against offenders tends to a culmination in a final and irrevocable result. The steps are numerous, and afford an opportunity to consider at most of them.

[Commonwealth *v.* Mayloy.]

In the first place, a complaint must be made on oath—then a hearing before a magistrate—then a bill of indictment to be prepared by a public officer—then an examination into the grounds of complaint by a grand jury—process for witnesses, and counsel is allowed—a time is fixed for trial—limited peremptory challenges and for cause without limit are allowed; and on the trial the prisoner must be confronted by the witnesses. If convicted on a full trial, he is allowed time in which to move an arrest of judgment or for a new trial, and in this a review of all that has been done may be had; and finally, if he allege error in the record he is entitled to a writ of error to carry his case to the court in the last resort. After this he may allege everything in his power to mitigate the sentence. No one can doubt that after all this the judgment or sentence pronounced, which is but the judgment of the law, was intended, and ought to be final so far as the courts are concerned. With the execution of the sentence which follows courts have nothing to do, nor ought they.

It cannot be doubted, I think, that the practice claimed, although it might be a great relief to the mind of a judge, would, to a great extent, be destructive to one of the objects of punishment, namely, the reformation of the offender. Let it be understood that he may have a portion of his sentence remitted any day by the judge, he will occupy his thoughts with the expectation, daily and hourly, and scheme and labor for the result. In such a state of mind reformation would be out of the question. His term of punishment would always be an uncertainty to him. A practice fraught with such results could scarcely have its origin in any considerable amount of experience in dealing with convicts, and ought to be regarded as an argument against its existence altogether. Another ground of argument was, that it is sanctioned as a local custom. General it is not, as we know, and the numerous letters of the judges throughout the state prove. That a practice to some extent existed in the courts of Philadelphia before any of the present learned judges came upon the bench, vindicates them from the charge of innovation, but it had neither the frequency nor long usage to give it the force of law. It should possess this to overrule both the practice and the maxims of the law. The paper-book of the defendants in error, the relators, exhibits less than half a dozen authentic cases in as many years before the year 1851, all occurring within twenty-three years of this time. Doubtless there have been many since the former period. A prescriptive right to an easement on the presumption of the payment of a bond ought to be founded on such a lapse of time, but a custom to have the effect of law must have had its origin "time when the memory of man runneth not to the contrary." This is the first ingredient to establish a custom with the force of law by which courts are bound, and of which they will

[Commonwealth *v.* Mayloy.]

take notice. The practice of courts, it is admitted, may be established without written rules as its foundation, in some cases, in a shorter period. This results because of the convenience to courts and to suitors, and has its purpose only in facilitating results. Very different is the foundation and maturity necessary to constitute good customs, general or local. They become laws from immemorial and universal acquiescence, either in a neighborhood affected, or in the entire community to be affected. We think there is nothing in the position of a local custom, to justify the practice claimed and exercised in the cases in hand.

It seems to us, therefore, to result necessarily from these views that the practice is neither sustainable by the common law, as an inherent power in the courts, nor has it ever been received as the common law of the state; nor a good local custom within this county; nor a rule of practice within the power of the court to adopt either expressly or by usage. On none of these grounds do we think the court sustained in altering the sentence in the cases before us. Indeed it seems to me, the existence of the pardoning power, conferred on the executive by the constitution, is an argument against the practice. It must have been introduced to meet cases, amongst others, where the judgments were founded in mistake, or too harsh, or where reformation was supposed to be complete in the convict. But by the practice in question, all this would in effect be drawn to the courts, and the constitutional power rendered almost useless. I would not here say, that the proceeding is absolutely in conflict with the constitutional provision. That is not called for, and we express no opinion upon it.

There is still another difficulty in the way, and that is not removed by the assumption that it would never occur. Bad or weak men might be found, to set aside such a presumption if made, and that is, that if a sentence may be reconsidered during its execution, why may it not be increased as well as diminished, if the maximum had not been reached in the first instance? If reconsidered, it is to be pronounced *de novo;* and it is within the same power, exactly, to increase or decrease it. It is not difficult to imagine times in which the rule might thus became despotic and most oppressive. If the criminal courts were to remain always as we know them now, this consideration would be disarmed of its unfavorable aspect; but we have no guaranty for this.

But again, if the rule may be granted and exercised once, I see not why it might not be renewed when the convict is resentenced and the sentence again changed a second or a third time. I see no restriction to the power if once exercised at the discretion of the court. It may be it never would be, more than once, but that is not the point, if the power exists.

But the right is claimed to exist *ex necessitate rerum.* The

[Commonwealth *v.* Mayloy.]

argument embraced in this view seems to assume that the terms of the courts being monthly, sentences must or usually are necessarily deliverable in every case, owing to the pressure of business, and the changes, or rather the rotation, of the judges, before the end of each term.

But there is no law requiring this. Nor is it always possible. Prisoners tried within the last four days of the term cannot be deprived of their legal right to the allotted period, to prepare and make their motions for new trials. If the term ends too soon for this, motions may be made within the allotted period after the commencement of the succeeding term. We do not, therefore, perceive any peculiar difficulty from this source. The court has power to remand and hold convicts for sentence as long as may be deemed necessary and advantageous to the ends of justice, and in the mean time, may receive information in addition to that disclosed on the trial, in regard to what should be an appropriate sentence, under the circumstances, where the court has a discretion on the subject. Indeed the trial, and the argument of motions for new trials, generally develop the data of which to predicate a judicious and proper sentence. But whether or not, there is no such thing as the *right* of the convict to be heard by the judge or court after sentence, especially after the term. He must resort to the Executive, if he thinks injustice has been done him.

No doubt it is often embarrassing and painful to a judge to sentence, because of doubts in regard to the character of the convict and the motives and incentives which may have led him into crime at the moment of its commission. But that difficulty has to be encountered by judges outside of, as well as in, cities, and a practice designed to mitigate the supposed evils, has not been resorted to in the country, or a reform demanded in order to relieve against it. It is true, the number of convictions are vastly greater in the cities than in country districts. But the difficulty in dealing with them in the same manner in both, is rather in the want of judicial force, than in the forms and requirements of the laws. The remedy for this would be to increase the force, if insufficient, and then consider well doubtful cases, ponder long, before sentencing, and act on the best lights at hand. If there be error then, it must be arrested by executive clemency, if at all. The real difficulty is not surmounted by the practice contended for. A judge is quite as likely to be embarrassed and deceived in passing the last, as the first sentence. Certainty about motives and inducements, which are things to be considered in passing sentence, can never be certainly known under any circumstances. A proximate accuracy in administering justice is all that is possible in human tribunals, and the practice contended for promises no more if adopted, even in the highest anticipations of its most earnest advocates, and may be fraught with many evils besides that of doing

[Commonwealth v. Mayloy.]

in the name of the law, what we think cannot be found to be authorized by law. For these, and other reasons which might be given, we feel constrained to differ from the learned judges of the Quarter Sessions, and to set aside the sentences passed upon the prisoners Mayloy and Keating, on the 20th of January 1868, pursuant to the rule to reconsider sentence entered on the 15th of July 1867, and made absolute on the 16th of January 1868, and affirm the original sentence of July 15th 1867, and refuse the prisoners' discharge on the habeas corpus.

The second sentence reversed, and discharge on habeas corpus refused; costs to be paid by the county.

Per Cur.