## Commonwealth v. Donovan.

*Criminal law—Parole—Prison bounds—Discretion of court—Condition of prisoner—Act of May 11, 1923.*

1. The discretion given to judges under the Act of May 11, 1923, P. L. 204, to release prisoners on parole is a legal discretion founded on good reason after due hearing. Its exercise is not to be influenced by impulse, prejudice, caprice or popular clamor.

2. The principle of "prison bounds," formerly limited to civil cases of prisoners confined for debt, etc., is now in an emergency extended by law to apply to criminal cases.

3. The court, in determining whether a prisoner should be released on parole, will consider the physical condition of the prisoner himself and whether his life may be endangered by further unmodified confinement.

4. Where several physicians testify that a prisoner is suffering from acute diabetes and heart disease, which confinement, lack of exercise and want of proper diet will aggravate and probably lead to his premature death, a parole will be granted.

Petition by defendant for parole. Q. S. Susquehanna Co.

*E. P. Little*, District Attorney, for Commonwealth.

*J. M. Kelly* and *P. T. Lonergan*, for petitioner.

SMITH, P. J., Oct. 6, 1924.—While all court proceedings are public in their hearings, generally speaking, the matters in controversy are of private import, interesting chiefly to the immediate parties thereto, and abbreviated discussions and short orders are only required, but instances occur when the principles involved are such as to affect the public. Their only method of information is what the court may put on record by way of an opinion, and this properly calls for a full discussion of the law and reasons which control the decisions rendered. Such is that under consideration here, in view of the novelty of the cause assigned for parole, as being within the Parole Act of May 11, 1923, P. L. 204, which explains the lengthy character of this opinion.

Upon pleas of guilty by D. J. Donovan in two separate and consecutive prosecutions for violation of the 1923 Act, relating to traffic, etc., in intoxicating liquors, we imposed sentence in one of imprisonment for one year in the county jail, $1000 fine and costs, and suspended sentence of one year imprisonment in the other. Eleven days later, on his petition for parole, a hearing, after due notice, was had, at which witnesses testified for the petitioner and for the Commonwealth. . . .

The Parole Act of May 11, 1923, P. L. 204, provides that "courts of record having jurisdiction are authorized, after due hearing, to release upon parole any convict confined in the county jail," etc.; this being the third and last statute by amendment upon this subject, commencing with that of 1911, P. L. 1059.

While several courts, including this, have acted under this legislation and granted paroles, only five written opinions appear in the reports of lower court decisions, viz.: Com. *v.* Zimmerman, 19 Dist. R. 248; Com. *v.* Collins, 11 Del. Co. Reps. 167; Com. *v.* Walker, 11 Del. Co. Reps. 171; Com. *v.* McZulski, 12 Lacka. Jurist, 380; and Com. *v.* Ferraro, 12 Lacka. Jurist, 291, all before the last amendment, 1923, which substituted the words "after due hearing" for "after due inquiry" in the earlier statutes, with the evident commendable purpose of better enabling the courts to ascertain all the facts after hearing sworn testimony, upon due notice and opportunities for examination and cross-examination, authority to adjudge upon substantial grounds rather than the uncertainties which were likely to follow their separate "inquiry."

Commonwealth v. Donovan.

The fact, however, remains, as stated by Edwards, P. J., of Lackawanna County, that "the main consideration is the individual himself. The object to be accomplished is his reformation, . . . is he for any reason worthy of the clemency he claims from the State under the provisions of the Parole Act?" 12 Lacka. Jurist, 291, 292.

In his general recital of the proper subjects-matter for consideration, we observe they relate to the circumstances and character of crime committed, the moral status and environment of the defendant, and the like; his serious illness and precarious physical condition, endangering his life by further unmodified confinement, are not mentioned; but as they were not material to the case before him, we do. not understand he would exclude them in a proper case, and for the further reason that, earlier in his opinion, he says: "The matter is evidently left to the discretion of the judges, because the power to release is to be exercised 'after due inquiry' (now 'after due hearing') ; it is difficult to lay down rules that will be exactly applicable to all cases. Each case must be decided upon its own facts."

It will be noted that by the Act of 1923 "the courts are authorized" to extend the clemency mentioned therein. "Authorized" means they shall, in their discretion, grant or withhold, as the facts justify. This judicial discretion, as defined by legal authorities, means "a legal discretion founded on good reason:" Lyons v. Miller, 4 S. & R. 279, 280. As was said In re Report of Auditors, 1 Woodw. 270, being "not at liberty to admit the influence of its appeals as the legislature or governor of the state," meaning, for the purposes of legislation, commutation or pardon. Quoting further from case last cited: "Nothing would be more capricious than the decision of judges produced by what may appear to be at the moment the current of popular opinion, or the views of the political majority for the time being in a township, county or a state. If the theory were once recognized that judges should act independently of rules and without regard to their own precedents at the dictation of popular majorities, the office would be a by-word and a sham. Acting upon settled rules, the bars, suitors and community can depend upon safe and permanent action." The same jurist warns against the arbitrary exercise of discretion by saying: "Mere discretionary power has always been mere despotism. . . . It must not be settled by impulse, prejudice and caprice." And we may add, or sympathy. By one of the most learned Pennsylvania jurists, of whom we are proud to know that early in his judicial career he presided, locally in this county, as Chief Justice of the Supreme Court of this State, it is said in Green v. Hern, 2 P. & W. 167, 169: "Unfortunately, a love for novelty is abroad; and it has become the fashion with a class of reformers to despise the black-letter maxims of a system to which our forefathers clung as their best birthright and noblest inheritance. There would be just cause for alarm did the same fashion obtain on the bench," to which all thoughtful persons will give present assent. We shall endeavor to avoid this fault by adhering to what is well and beneficially established.

We refer without quotation to an informing discussion of this important quality of the judges in Endlich on Interpretation of Statutes, § 147, etc., which puts a weighty responsibiltiy on the court in such a case as at bar that both a "just and humane administration shall be attained:" Com. v. Zimmerman, 19 Dist. R. 248, wherein Wanner, P. J., of York County, was moved to a reduction of prison sentence because the defendant was suffering from tuberculosis, on certificates of physicians that "long confinement in jail will prevent proper treatment of and aggravate the same, so that recovery thereafter may be impossible."

Any clemency at bar by way of *mitigation* of sentence is beyond our reach, because of expiration of term and time when imposed, and were it not for the Parole Act of 1923, it is possible the relief prayed for could avail only by appeal to the Pardon Board or to the Governor: See Com. v. Mayloy, 57 Pa. 291.

Obviously, not all cases of physical weakness or disease conditions of those under sentence would warrant judicial intervention. Not all convicted persons are healthy, but no one, even the most charitable and humane, would presume upon indiscriminate release for such reasons, and imposition must be guarded against; only extreme and serious conditions justify indulgence, and the evidence before us presents such, for Dr. E. R. Gardner testifies that the valvular heart trouble affecting the defendant is "one of the most serious ailments, chronic ailments, that we have to deal with."

To determine the mode and extent of relief we should grant at bar, which is not on the ground assigned in the petition, clearly expressed in the Parole Act, we adopt rules of interpretation and application established by our appellate court decisions.

Our Supreme Court has many times held that the courts may disregard the strict literal meaning of a statute and give effect to its manifest intent in order to do justice (see cases cited in 8 Vale Digest, col. 2483); and "If a particular remedy is within the spirit of the statute, it will be construed as covered by it, though not within the letter of the act: Schuylkill Navigation Co. v. Loose, 19 Pa. 15, where it is declared by Lowrie, J., as exemplifying the principles he quotes from 2 Institutes, 280 and 56, that "There is an abiding and productive truth in the old thought that nothing is more glorious and necessary to a state and to its citizens than full execution of justice," and "Neither the end, which is justice, nor the means by which a man may attain the end, and that is law, shall be denied."

The verity of these utterances will be readily accepted by liberty-loving people everywhere, and, conscientiously exemplified, they afford them immunity against intolerance, despotism and tyranny, which have no place or part in halls of justice.

Pursuing the orderly mode of judicial hearing provided in the act, four physicians were called by and testified for the defendant petitioner, whose attorneys then stated to the court their evidence was closed and rested their case and ready for argument and decision, opposing district attorney's motion for an adjournment at which to present evidence contrary, which was clearly his right, which we granted, at which the petitioner's attorneys asked leave to call three additional medical experts to testify as corroborative to facts already given in chief, which we refused because of their having previously "closed their case." This offer was again renewed after the four medical experts had testified in behalf of the Commonwealth; again, we refused for the same reason as before, and there being no offer to rebut the Commonwealth's evidence, which, if made, we would have allowed as of course, if rebuttable testimony had been elicited by the Commonwealth.

The medical witnesses for both the petitioner and the Commonwealth testified in substantial agreement as to the serious physical condition of the defendant, as being afflicted with both valvular heart disease and sugar diabetes; the first being, as we have stated from the evidence of Dr. E. R. Gardner, "one of the most serious ailments, chronic ailments, we have to deal with." Further, that these ailments rendered his health precarious, with possibilities against improvement of either, but they were likely to grow worse. Thus, equivalent to eight qualified medical experts for the petitioner on this phase of the allegations, and none testifying to the contrary on either side,

and all after personal diagnosis and tests, it appears that the defendant has been thus afflicted for upwards of four years past.

There is no evidence of any recent increase in the severity of those symptoms except that one physician testifies that, on his second examination of the defendant, eighteen days after the first, both in his confinement, "he has definitely lost out in his muscular tone of his heart's action during the short time of his confinement." The defendant had then been confined twenty-two days.

The real conflict in the evidence is as to the injurious effect upon his health regarding his ailments and necessity for his parole. We now quote the most positive utterances of petitioner's witnesses: Dr. Birchard says: "It will increase his diabetic condition and also his heart condition, diseased condition, I mean, . . . have bad effect on his health, . . . will shorten his life."

Dr. Gardner testifies: "I think it detrimental to both conditions," and in answer to the question, "And if continued, would it, in your opinion, have any effect or endanger his life, in that respect affect him?" answered, "Yes."

Dr. Mackey questions and answers thus: "Q. Considering he is confined in the county jail and has diabetes and heart trouble, a continual confinement under these same conditions, these same diseases, what effect would it have upon his health? A. It would be bound to be a deleterious effect. Q. Would it affect the length of his life? A. Tend to shorten his life." The same witness again says: "I think that every day that this defendant is confined is deleterious to him and capable of producing more harm." "Q. Is there actual danger of it? A. There is actual danger, I should say."

Dr. Preston limits his testimony to his discovery about four years ago to this defendant's valvular heart and diabetic troubles.

As to the evidence of the four medical witnesses called and testifying on behalf of the Commonwealth on this same point, Dr. Merrell, in answer to a question embodying jail conditions (Evidence, page 35), expresses the opinion that Mr. Donovan's life would not be endangered by confinement for the period sentenced; that "he would not be injured seriously;" that "his health is not being impaired to such an extent that he needs freedom in the open air," while of the opinion "it would have no bad effect on his health, yet would not benefit it."

In answer to the question: Q. Will it harm him?" A. "That is a hard question to answer. Why, I do not think it will harm his health or aggravate his diabetic condition."

Dr. Blair testifies he could not see why it should be deleterious or materially impair his health, nor does he think it will necessarily endanger his life.

Dr. Snyder: "I believe he could get all the exercise it would be best for him to take in the jail-yard; . . . not as much as some diabetic patients could, because of the condition of his heart; . . . that it would not necessarily endanger his life; . . . he could get fresh air and all the exercise it was proper for him to take."

Dr. Fry says that such confinement with exercise in jail-yard, "I think would not endanger his health;" and, on cross-examination, that "such confinement would, I think, be rather beneficial to his heart trouble and it would not do him any harm, . . . wouldn't in any wise affect his heart trouble." And in answer to the question: Q. "Take a man, doctor, of his type, his build, his age and his weight, and who has been used to exercise in the open air and confine them in jail as you found with heart trouble and diabetic trouble you found, wouldn't the confinement be injurious to his health?" A. "In a certain way, it might be."

Commonwealth v. Donovan.

There is a common concurrence of all the witnesses (except Dr. Preston, whose evidence is limited as before stated) that intermittent periods of rest and moderate exercise in the open air. and sunshine, and careful, strict diet under the supervision of medical attention and advice are essential, opportunities for which, except diet, petitioner's witnesses assent do not exist in the jail-yard, approximately sixty feet square, with side walls of about eighteen feet in height, objectionable because of its confined limit, forming a sort of pocket, preventing free circulation of air and absence of sunshine.

The respondent's witnesses generally testify to the contrary, but, we suggest, not so positively.

In view of the difference of opinion thus expressed, we think it is due all the witnesses to say they are all of personal probity and professional ability, which would undoubtedly result in the same divergence as if all were in consultation in a similar case, which would result in accepting the majority judgment or the patient being left to his own choice, a situation of difficulty similar to our own.

On personal view of the jail-yard, we find at the noon hour fifteen feet of the ground therein, towards the sun, in shadow, which will be obviously increased in the coming months, when the course of the sun gradually is nearer the horizon, and it needs no professional opinion to convince of the benefits of its rays upon mankind, especially to those ill, and obviously the circumscribed limits of the jail-yard would discount the benefits arising from exercise outside its walls, and while not a reason for clemency, such as here asked for, in ordinary cases of physical ailments, we are of the opinion it is sufficient here.

The anxiety as to the possible outcome of defendant's complaints, which is shared by all, has been accentuated to me the past week by the knowledge of symptoms, which fortify the conclusions as to the necessity of the order we shall make.

In 2 Burns' Justice, 341, as early as the year 1780, as to jails, it was commanded that the condition of their inmates "be rendered as tolerable as the case will admit of, particularly with regard to cleanliness, which is the parent of health, and wholesome air, which is life itself." And further related in 1773 salutary improvements in these respects were effectuated in English prisons through the efforts of John Howard, Esq., Sheriff of the County of Bedford, and are now being more effectively applied for the comfort and health of those now in prison in all civilized countries, and unreasonable neglect or omission of them are subjects of universal criticism and condemnation.

An early English provision for such amelioration of conditions was the privilege of "prison bounds," defined as "the limits of the territory surrounding a prison, within which an imprisoned debtor, who is out on bonds, may go at will:" 32 Cyc., 316 D; and as the jail-yard is a part of the jail (Green v. Hern, 2 P. & W. 167), means beyond its limits; in effect, an extension of the technical confines of the jail, recognized in Pennsylvania (Green v. Hern, 2 P. & W. 167), departing beyond which the prisoner would be guilty of "escape:" Green v. Hern, 2 P. & W. 167; also, 32 Cyc., 327. This privilege appears to have been generally expressed by statute and limited to those imprisoned for debt in civil cases, and denied those under sentence on conviction for crime: 32 Cyc., 330, referring to State v. Pearson, 6 S. E. Repr. 387, cited in foot-note. This appears under a statute of North Carolina, in which the opinion of the court implies that, had a motion therefor been made at time of sentence, as the statute seems to require, "prison bounds" would have been allowed.

Commonwealth *v.* Donovan.

But further, we find it decided, "there are some *emergencies* which have been declared a sufficient excuse for a prisoner's temporary liberty:" 36 *Cyc.*, 336 *C*, citing in note two illustrations.

Governed by these legal authorities and principles, carefully considering all the evidence given by medical experts, from whom only reliable information is obtainable in such matters, we are satisfied of an "emergency" before us. For what are more prized than good health and desire to live at least the allotted period? It is not intended that the rigor of the law shall preclude its administration by the courts in a humane manner so as to conserve these possessions, which in these days enlightened public opinion approves; and it is neither the purpose nor policy of even the criminal law or the courts to consciously jeopardize. Any other interpretation would justly subject the courts to the charge of judicial tyranny; but, rightly applied [a humane administration], will continue to inspire confidence in the security of person and property adjudicated by them.

We are of the opinion that the requisite relief here is by an order of this court granting to the defendant privileges of the nature of "prison bounds" or "jail limits," which, aside from what we believe is the inherent power of the court, is within the spirit, if not the strict letter, of the Parole Act of May 11, 1923, P. L. 204, an authorization later than the date or term at which sentence was imposed, and, for that reason, not negatived by the decision in 6 S. E. Repr. 387, refusing "jail limits," application for which must have been made at time of sentence, under the North Carolina statute.

Although such order will not allow of that entire freedom of the defendant from restraint he prays for and desires, it grants him the opportunity of the preventive and remedial treatment recommended and deemed necessary, as we find from the evidence of the medical witnesses, for the disease described.

Considering both the interests of the defendant and that of the public weal, which, for the present purposes, are the subject of law observance and law enforcement, concerning which the purpose of this court was expressed in our "remarks" on day of sentence and now of record and which were published, which we reaffirm, we are satisfied we thus afford full judicial clemency under the circumstances.

Since writing the foregoing part of this opinion we learn through the jail physician, Dr. E. R. Gardner, that the defendant experienced on Monday last week an acute aggravation of his heart trouble, from which his condition was critical; thus, we have a verification of the most extreme expression of opinion of the medical witnesses upon the stand at the time of hearing. Because of the limit of knowledge and foresight of mankind, both lay and professional, and their futility to correctly diagnose physical conditions, we are forced to give the petitioner the benefit of the doubt, as we believe all right-thinking persons would do. This court, as at the present constituted, will not assume the risk which appears imminent by further confinement of the defendant at this time, neither does the law require it in a case like the present; its spirit as well as humanity forbids it.

It may be superfluous, but we mention it to refer to our many hours of anxious responsibility in considering the situation in all its aspects, which we realize cannot be understood by others not in our position. Because of the added urgency arising from what occurred to the defendant last Monday, we authorized the sheriff to remove the defendant from the jail to his home, because of the utter absence of suitable provisions in the former for his care and treatment.

Defendant's physical ailments being the sole reason assigned for clemency, our discussion and conclusions are necessarily confined thereto; noting that

Commonwealth v. Donovan.

the defendant did not testify, and not until petition filed were those conditions brought to our attention for either mitigation of sentence or clemency; nor has there yet appeared any suggestion of change of his attitude regarding his past or future conduct made to the court.

A denial of the indulgence we grant would savor of a return to the practices of the dark ages and cruel methods of judicial administration by George Jeffery, an English justice in the seventeenth century, by which he "prostituted the seat of justice" and made his name a "by-word of infamy" throughout the world; a condition no less venial than anarchy, which is a state of society without any law, or a general disregard of all law.

It is due that we acknowledge the conscientious discharge of duty in this case by the district attorney and attorneys for the defendant, whose responsibilities are comparable to ours; also the personal and professional probity, ability and skill of all the medical witnesses; of the integrity of their opinions as experts given in evidence we have full confidence; all have been of invaluable assistance to the court in this matter. We commend them all.

As the jail-yard is the only out of doors area available for exercise, we wish to emphasize what we said at the hearing, that if not already accomplished, it should be immediately cleansed of all objects, either deleterious to health or offensive to the eye or smell, to be so kept by the sheriff or county commissioners, or both, and no such deposits therein [allowed to] recur. This the health and comfort of the jail inmates requires and public opinion demands it.

And now, Oct. 6, 1924, in open court, we affirm the authority we gave the sheriff last Tuesday to transfer the defendant petitioner to his home; to remain in force pending such further action as subsequent developments on application shall sanction.

### Supplemental petition for parole.

To the Honorable A. B. Smith, President Judge of said court:

D. J. Donovan, being duly sworn according to law, deposes and says that he is desirous of supplementing his petition for parole filed in above case by adding to the same the following:

1. That he is advised by his physician that, since filing his petition for parole, his physical condition has been greatly injured and impaired by confinement in the county jail, and that further confinement therein would greatly jeopardize his health and more seriously endanger his life.

2. That if granted the parole petitioned for by your honorable court, he hereby pledges your honor that he will strictly and faithfully comply with all laws, State and Federal, relating to intoxicating liquor, and urges your honor to deal mercifully with him under the circumstances and grant the parole prayed for, and he will ever pray, etc.                    D. J. DONOVAN.

Affidavit dated Oct. 4, 1924, attached.

### Court order.

And now, to wit, Oct. 6, 1924, we have this day made and filed an opinion, in which we made a temporary order affirming one made at chambers that the sheriff may transfer D. J. Donovan, the within named defendant, from the jail to his home on account of his serious illness, no suitable conditions at the jail for his treatment, which order was indefinite as to its duration; the same is to continue until the last Monday of October, 1924, and the within affidavit is allowed to be filed as an amendment to the defendant's original petition for parole, and hearing hereon continued to the last Monday of October, 1924, at 10 o'clock A. M., notice not being given the district attorney of

Commonwealth *v.* Donovan.

the filing hereof because of his absence from Montrose when presented for filing, 4.50 P. M. this date; no final disposition of the original application for technical parole having been made.

### Addendum.

After due hearing held on Oct. 28, 1924, the court handed down the following order extending the parole granted D. J. Donovan on Oct. 6, 1924:

Therefore, and now, to wit, Oct. 29, 1924, the defendant, D. J. Donovan, having secured the payment of his fine and costs imposed in this case, and pledged his future observance and compliance of law and that he will not violate the same, he is hereby released from imprisonment under sentence imposed by this court Aug. 21, 1924, upon parole, subject to all the conditions relating to the Parole Act of May 11, 1923, P. L. 204, and for the purpose of this order, as by the said statute provided, the said D. J. Donovan is hereby placed in charge and under the supervision of John C. Harrington, of Montrose, Pa., who is hereby appointed probation officer, who shall be permitted at any time to make personally any inquiries and investigation of the defendant, or upon his premises or elsewhere, as he deems wise and necessary, affecting his conformity to the terms of this parole.

That the said defendant, D. J. Donovan, report monthly on the first day of each month of the period of this parole to the said John C. Harrington, probation officer, commencing with Dec. 1, 1924, and that the said probation officer likewise report to the court monthly as to defendant's compliance with the terms of this order. And we urge upon both that degree of frankness of contact, communication and good-fellowship between them and both with the court, which we will reciprocate, as will, we believe, assure and effectuate the results which this clemency is intended to accomplish, and prove an effectual example of law observance and its advantage to all within our jurisdiction.

It is further ordered that the defendant pay the costs of these parole proceedings within thirty days from this date.

From Gerritt E. Gardner, Montrose, Pa.