## UNITED STATES of America

v.

**George Gordon LIDDY, Appellant.**

**No. 73–1564.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 14, 1974.

Decided Dec. 12, 1974.

Certiorari Denied March 17, 1975.

See 95 S.Ct. 1408.

Peter L. Maroulis, Poughkeepsie, N. Y., for appellant. Thomas A. Kennelly, Washington, D. C., also entered an appearance for appellant.

Sidney M. Glazer, Asst. Sp. Prosecutor, for appellee. Leon Jaworski, Sp. Prosecutor, Philip A. Lacovara, Counsel for the Sp. Prosecutor, Richard D. Weinberg and Robert L. Palmer, Asst. Counsel to the Sp. Prosecutor, were on the brief for appellee. Archibald Cox, Sp. Prosecutor at the time the brief was filed, was on the brief for appellee.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, LEVENTHAL, ROBINSON, MacKINNON and WILKEY, Circuit Judges, sitting en banc.

WILKEY, Circuit Judge:

On 23 March 1973 appellant George Gordon Liddy was sentenced by the District Court to a prison term of not less than six years and eight months and not more than twenty years and was fined $40,000 for crimes which he had been found to have committed in connection with the electronic surveillance and burglary of the Democratic National Headquarters in the Watergate apartment complex.[1] Three days later, Liddy appeared in response to a subpoena before the 5 June 1972 Watergate grand jury. In response to questioning by Government prosecutors about his role and the roles of others in the Watergate incident, Liddy consistently asserted his Fifth Amendment privilege against self-incrimination. Upon the Government's motion the District Court granted Liddy immunity[2] and ordered him to testify. Nevertheless, Liddy persisted in refusing to answer the grand jury's questions.

Consequently, on 3 April 1973 the District Court adjudged Liddy in civil contempt under 28 U.S.C. § 1826 (1970)[3] and ordered that he "be confined until such time as he is willing to testify as ordered; provided, however, that the period of confinement shall not exceed the life of the grand jury, including extensions, and shall in no case exceed eighteen (18) months . . . ."[4] The

---

1. He was convicted on all six counts of an indictment charging him with burglary (22 D.C.Code § 1801(b) (1973)), conspiracy (18 U.S.C. § 371 (1970)), and illegal interception of oral and wire communications (18 U.S.C. § 2511 (1970)). This conviction was affirmed on appeal in United States v. Liddy, 166 U.S App.D.C. ——, 509 F.2d 428 (1974).

2. Under 18 U.S.C. § 6002 (1970).

3. § 1826. Recalcitrant witnesses

(a) Whenever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify or provide other information, including any book, paper, document, record, recording or other material, the court, upon such refusal, or when such refusal is duly brought to its attention, may summarily order his confinement at a suitable place until such time as the witness is willing to give such testimony or provide such information. No period

of such confinement shall exceed the life of—
　(1) the court proceeding, or
　(2) the term of the grand jury, including extensions,
before which such refusal to comply with the court order occurred, but in no event shall such confinement exceed eighteen months.

(b) No person confined pursuant to subsection (a) of this section shall be admitted to bail pending the determination of an appeal taken by him from the order for his confinement if it appears that the appeal is frivolous or taken for delay. Any appeal from an order of confinement under this section shall be disposed of as soon as practicable, but not later than thirty days from the filing of such appeal.

This contempt judgment was affirmed on appeal in In re Grand Jury Proceedings (George Gordon Liddy), 165 U.S.App.D.C. 254, 506 F.2d 1293 (1974).

4. Appendix to Appellant's Brief [hereinafter A.App.] at 20.

court then entered the following order, which is the subject of this appeal:

Title 18 of the United States Code § 3568 provides that a person's sentence begins to run from the first day of commitment, and that credit is given for any time spent in custody in connection with the offense for which sentence is imposed. The defendant Mr. Liddy's sentence under the indictment, therefore, has commenced. The present commitment for contempt, however, is a commitment for a separate offense, and is intended not to punish but to compel compliance with the Court's order to testify. To give meaning and coercive impact to the Court's contempt powers in the interest of protecting the Court's integrity, the Court here finds it necessary to hold in abeyance the execution of Mr. Liddy's sentence under the indictment pending his confinement for contempt.[5]

Liddy challenges the authority of the District Court to suspend the execution of his sentence pending his confinement for contempt. We conclude that the District Court acted within its authority, and therefore affirm.[6]

## I. AUTHORITY OF DISTRICT COURT OVER RUNNING SENTENCE

■ Liddy's attack on the suspension of his sentence by the District Court rests in part on the following statements by the Supreme Court in United States v. Murray:[7]

The beginning of the service of the sentence in a criminal case ends the power of the court even in the same term to change it. Ex parte Lange, 18 Wall. 163.

. . . . .

It is true that there was but one day of execution of the sentence in the *Murray* case, but the power passed immediately after imprisonment began and there had been one day of it served.[8]

Liddy argues that since he began service of his sentence for Watergate crimes before the District Court adjudged him in contempt,[9] the court was without authority to change his sentence by suspending its execution. However, the foundations of this argument are undermined by the unanimous Supreme Court decision in United States v. Benz,[10] which expressly

---

**5.** *Id.* at 22–23.

**6.** We have concluded that the District Court's order is a final decision that is ripe for our review under 28 U.S.C. § 1291 (1970). Arguably, Liddy should be made to wait until what would have been the expiration date of his sentence had the sentence not been suspended, at which time he could move the sentencing court for release under 28 U.S.C. § 2255 (1970). However, if we were to permit the questions raised in this appeal to remain unanswered until that time, much of the coercive effect of the District Court's contempt order would be dissipated since Liddy could then entertain some hope that he might subsequently receive credit toward his running sentence for his time spent in confinement for contempt. Since the District Court expressed the desire to "give meaning and coercive impact to the Court's contempt powers," we may fairly construe its order as a declaratory judgment that it would deny any future motion by Liddy under 28 U.S.C. § 2255. The challenged order thus " 'leaves nothing to be done but to enforce by execution what has been determined,' " Berman v. United States, 302 U.S. 211, 213, 58 S.Ct. 164, 166, 82 L.Ed. 204 (1938), *quoting* St. Louis, I. M. & S. R. R. Co. v. Southern Express Co., 108 U.S. 24, 28, 2 S.Ct. 6, 27 L.Ed. 638 (1883), so we deem review to be appropriate at this time.

**7.** 275 U.S. 347, 48 S.Ct. 146, 72 L.Ed. 309 (1928).

**8.** *Id.* at 358, 359, 48 S.Ct. at 149–150. *See also* Egan v. United States, 268 F.2d 820, 823 (8th Cir.), cert. denied, 361 U.S. 868, 80 S.Ct. 130, 4 L.Ed.2d 108 (1959), which cited the *Murray* and *Lange* cases for the proposition that "the beginning of the service of the sentence in a criminal case ends the power of the court to change it."

**9.** This was conceded by the District Court in its 3 April 1973 order. A.App. at 22.

**10.** 282 U.S. 304, 51 S.Ct. 113, 75 L.Ed. 354 (1931).

discredited the above-quoted language from *Murray*.

In *Benz* the defendant had been sentenced to 10 months imprisonment beginning 27 December 1929. Before expiration of his sentence, the defendant filed a petition with the sentencing court seeking a reduction in his term. The court granted the petition and reduced the sentence to six months. The Government appealed, relying principally on *Murray* and *Ex parte Lange*.[11] In affirming the District Court's action, the Supreme Court first demonstrated that *Lange* did not stand for the proposition for which it was cited in *Murray*. The District Court in *Lange* made two erroneous sentencing decisions: 1) it sentenced the defendant to one year in prison *and* a $50 fine, although the governing statute provided for one year maximum *or* a $50 fine; 2) five days after the initial sentencing and after the defendant had paid the fine, the court vacated the first sentence and resentenced the defendant to one year in prison. Both these actions, the Supreme Court held, violated the Double Jeopardy clause of the Fifth Amendment by subjecting the defendant to more than one punishment for the same offense. But the Court in *Lange* also recognized, in the words of the *Benz* decision:

> The general rule is that judgments, decrees and orders are within the control of the court during the term at which they were made. They are then deemed to be "in the breast of the court" making them, and subject to be amended, modified, or vacated by that court.[12]

This analysis of *Lange* prompted the court in *Benz* to state:

> The *Lange* Case and the *Basset* Case, *supra*, [Basset v. United States,

76 U.S. (9 Wall.) 38] probably would have set at rest the question here presented had it not been for a statement in United States v. Murray, 275 U.S. 347, 358 [48 S.Ct. 146, 72 L.Ed. 309]. In that case this Court held that where the defendant had begun to serve his sentence, the District Court was without power, under the Probation Act of March 4, 1925 . . . , to grant him probation; and, citing *Ex parte Lange* as authority, said: "The beginning of the service of the sentence in a criminal case ends the power of the court even in the same term to change it." But the *Murray* Case involved the construction of the Probation Act, not the general powers of the court over its judgments. The words quoted were used by way of illustration bearing upon the congressional intent, but were not necessary to the conclusion reached. That they state the rule more broadly than the *Lange* Case warrants is apparent from the foregoing review of that case.[13]

It seems clear that Liddy's reliance on the broad language in *Murray* is misplaced in the light of *Benz*.

Two general principles may be gleaned from the *Lange* series of decisions, and neither of them is of any help to Liddy. First, *Lange* holds that a convicted defendant may not be punished twice for the same offense. Liddy continues to be subject to the same penalty for his Watergate crimes: a prison term of from six years and eight months to twenty years and a fine of $40,000.[14] Liddy's current confinement under the District Court's order of 3 April 1973 is for the separate and distinct offense of civil contempt under 28 U.S.C. § 1826. Second, as the Court in *Benz* recognized, "the court during the same term may amend . . . the punishment, but not so as to increase it . . . ."[15]

---

**11.** 85 U.S. (18 Wall.) 163, 21 L.Ed. 872 (1873).

**12.** 282 U.S. at 306–307, 51 S.Ct. at 114.

**13.** *Id.* at 309, 51 S.Ct. at 114–115.

**14.** Liddy does not challenge the legality of this sentence, which is clearly authorized by the relevant statutes. *See* note 1 *supra*.

**15.** 282 U.S. at 307, 51 S.Ct. at 114. *Cf.* Roberts v. United States, 320 U.S. 264, 265–266, 64 S.Ct. 113, 88 L.Ed. 41 (1943).

The District Court's 3 April 1973 order does not increase Liddy's punishment for his Watergate crimes, for the duration of his prison sentence and the amount of his fine are unchanged, but merely amends by delaying the execution of that punishment.[16] Thus, the *Lange-Benz* line of cases establishes that the District Court had control over Liddy's sentence when it entered its 3 April 1973 order, and nothing in those cases precludes our affirming the suspension of that sentence.

## II. THE BARRIER ALLEGEDLY POSED BY 18 U.S.C. § 3568

█ Liddy argues that the District Court's suspension of his running sentence violated the terms of 18 U.S.C. § 3568 (1970), which provides in pertinent part:

The sentence of imprisonment of any person convicted of an offense shall commence to run from the date on which such person is received at the penitentiary, reformatory, or jail for service of such sentence. The Attorney General shall give any such person credit toward service of his sentence for any days spent in custody in connection with the offense or acts for which sentence was imposed.

· · · · ·

No sentence shall prescribe any other method of computing the term.

Liddy interprets this provision in a literal fashion, contending that it establishes a strict method of sentence calculation that cannot be varied without some specific statutory authority.[17] Since Liddy's sentence concededly had commenced to run before the District Court entered its 3 April 1973 order, Liddy argues that the expiration date of his sentence had been firmly fixed as well and that, under section 3568, the District Court could not alter that expiration date by suspending execution of the sentence. We think that section 3568 cannot be read so liter-

16. Liddy cites Crowe v. United States, 200 F.2d 526 (6th Cir. 1952) for the proposition that postponing the expiration date of a sentence is tantamount to increasing it. *Crowe* is distinguishable, however, because the court there relied heavily on the literal terms of a probation order for which there is no counterpart in this case. On 13 March 1941, the District Court had sentenced Crowe to a prison term of one year and one day plus concurrent terms of five and three years to become effective upon expiration of the first sentence. The court had suspended the latter two sentences and placed Crowe on two years' probation beginning after expiration of the first sentence. On 19 October 1942, over seven months after Crowe's first sentence had expired, the court revoked his parole and ordered that he begin serving concurrent five-and three-year sentences. The Sixth Circuit remanded for correction of the sentence to give Crowe credit for the seven months following the expiration of his first sentence. The court stated:

The increase in the defendant's sentence made by this order is substantial. In the entry of March 13, 1941 the sentences of five years on the second count and three years on the third count were ordered to run concurrently and to become effective at the expiration of the sentence on the first count, that is, the sentence of a year and a day. The judgment and commitment of October 19, 1942 was for a period of five years "from and after this date" on the second count and three years "from and after this date" on the third count. But "this date," October 19, 1942, is over seven months more than a year and a day from March 13, 1941, the date of the defendant's first sentence. The order increases the original sentence by over seven months. Hence the judgment of October 19, 1942 is void to the extent of its excess over the valid sentences of March 13, 1941.

200 F.2d at 529 (citations omitted). The court thus based its holding on a literal interpretation of the District Court's 13 March 1941 order. No such order exists in this case to fix immutably the boundaries of Liddy's sentence.

17. As an example of such statutory authorization, Liddy cites Fed.R.Crim.P. 35, which provides:

The court may correct an illegal sentence at any time. The court may reduce a sentence within 120 days after the sentence is imposed, or within 120 days after receipt by the court of a mandate issued upon affirmance of the judgment or dismissal of the appeal, or within 120 days after receipt of an order of the Supreme Court denying an application for a writ of certiorari.

ally, and we therefore reject Liddy's argument.

■ The legislative history of section 3568 reveals that Congress' intent in enacting the provision was not to impose a rigid method of sentence calculation, beyond establishing a firm date of sentence commencement. In recommending the bill that ultimately became section 3568, the judiciary committees of both the House and Senate relied primarily on a Department of Justice memorandum which stated:

Sections 1 and 2 provide that sentence shall commence to run from the date on which the person is received at the institution for service of his sentence or from the date he shall be committed to a place of detention to await transportation to the place at which his sentence shall be served; that computations for deduction for good conduct shall be computed beginning with the day on which sentence commences to run. These provisions are very necessary to remove confusion under existing practices. There is often uncertainty as to when a sentence does commence to run and as to the date from which computation of good conduct deductions shall be computed. Many courts have a way of sentencing a prisoner for a year and a day to make him eligible for parole, and then providing in the sentence that it shall commence to run from some date prior to the sentence or some date before the prisoner actually commences his service, with the result that the parole law may be made applicable to a case where the prisoner actually serves less than a year. Various other instances of confusion, uncertainty and diversity of practice might be mentioned. These provisions produce certainty and prevent juggling with sentences in the way described.[18]

This passage demonstrates that when Congress enacted section 3568, it was primarily concerned with the commencement date of a sentence, not with its subsequent calculation and termination date.

There are numerous examples of situations in which the running of a prisoner's sentence is interrupted and, as a direct result of some action by the prisoner himself, the termination date of the sentence is postponed beyond the time the sentence would have ended had it not been interrupted. A prisoner who escapes from custody interrupts the running of his sentence, and "the time elapsing between escape and retaking contribute nothing to the service of the sentence."[19] A parolee who commits offenses leading to revocation of his parole must serve the portion of his sentence that remained to be served when he was paroled.[20] The effect of this rule is that the parolee's sentence is suspended during his time on parole and the expiration of his sentence is postponed beyond the original scheduled termination date. In McDonald v. Lee,[21] the Fifth Circuit stated:

At common law a prisoner has a right to serve his sentence continuously, and cannot be required to serve it in installments, but even at common law a continuous sentence may be in-

---

**18.** S.Rep.No.803, 72d Cong., 1st Sess. 2 (1932); H.R.Rep.No.960, 72d Cong., 1st Sess. 2 (1932).

**19.** Theriault v. Peek, 406 F.2d 117 (5th Cir.), cert. denied, 394 U.S. 1021, 89 S.Ct. 1644, 23 L.Ed.2d 47 (1968). *See also* Anderson v. Corrall, 263 U.S. 193, 44 S.Ct. 43, 68 L.Ed. 247 (1923).

**20.** Arrington v. Magruder, 160 U.S.App.D.C. 227, 490 F.2d 795 (1974); Bates v. Rivers, 116 U.S.App.D.C. 306, 323 F.2d 311 (1963). These cases interpreted the language of 24 D.C.Code § 206 (1973), whose counterpart for federal prisoners, 18 U.S.C. § 4205 (1970), has been similarly interpreted. *See* cases cited in Bates v. Rivers, 116 U.S.App.D.C. at 307, 323 F.2d at 312.

**21.** 217 F.2d 619 (5th Cir. 1954), vacated as moot, 349 U.S. 948, 75 S.Ct. 893, 99 L.Ed. 1274 (1955).

terrupted by some fault of the prisoner.[22]

On the basis of this exception,[23] the court held that it was permissible to interrupt a military prisoner's service of a ten-year court martial sentence to permit service of a six-month sentence imposed for a breach of conduct committed by the prisoner while in custody.

Liddy's position is similar to that of the prisoners in the examples discussed above. Through his intentional acts he has brought himself within the civil contempt provisions of 28 U.S.C. § 1826. Under the clear authority of that statute,[24] the District Court ordered Liddy confined pending his compliance with the court's earlier order to testify. The coercive impact of confinement for civil contempt results from the fact that the contemnor "carries the key to the jailhouse door in his pocket," that is, he can procure his release at any time by agreeing to comply with the court order whose violation is the basis of his contempt. Had the District Court ordered that Liddy's contempt confinement be concurrent with his sentence for Watergate crimes, Liddy would have no incentive to comply with the District Court's order since his doing so would not reduce his total period of confinement. Therefore, the District Court was manifestly justified when it stated: "To give meaning and coercive impact to the Court's contempt powers in the interest of protecting the Court's integrity, the Court here finds it necessary to hold in abeyance the execution of Mr. Liddy's sentence under the indictment pending his confinement for contempt."[25]

■ Liddy suggests, however, that the District Court could have avoided interrupting his sentence by choosing some alternative remedy for his contempt. For example, Liddy could have been adjudged in *criminal* contempt and sentenced to a fixed prison term.[26] While the District Court's power to punish Liddy for criminal contempt is uncontested,[27] there are limitations on the criminal contempt device that make us reluctant to insist that the District Court employ it here. First, criminal sanctions are extreme measures to which "[t]he judge should resort . . . only after he determines, for good reason, that the civil remedy would be inappropriate."[28] Second, a judgment of

---

22. *Id.*, 217 F.2d at 623.

23. And interpretation and application of the Uniform Code of Military Justice § 57(b), Act of 5 May 1950, ch. 169, § 1(b), 64 Stat. 126, now 10 U.S.C. § 857(b) (1970).

24. The court has been cited to nothing in section 1826 or the legislative history thereof to indicate that the provision was not intended to apply to contemnors already imprisoned for some other offense. *See* H.R.Rep.No.91–1549, 91st Cong., 2d Sess. 46 (1970), U.S. Code Cong. & Admin. News 1970, p. 4007.

25. Order of 3 April 1973, A.App. at 22. In its order, the District Court also observed:
    Title 18 of the United States Code § 3568 provides that . . . credit is given for any time spent in custody in connection with the offense for which the sentence is imposed. . . . The present commitment for contempt, however, is a commitment for a separate offense . . . .
    *Ibid.* The unstated conclusion of the court's reasoning is that section 3568 does not authorize conferral upon Liddy of credit toward his Watergate crimes sentence for his time spent in confinement for contempt. We think the District Court's interpretation of section 3568 was correct.

26. Pursuant to 18 U.S.C. § 401(3) (1970), which provides:
    A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority . . . as—

    .        .        .        .        .

    (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

27. Provided that the sanctions are "surrounded by the safeguards of an ordinary criminal proceeding." United States v. Di Mauro, 441 F.2d 428, 433 (8th Cir. 1971). *See* Cheff v. Schnackenburg, 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966) (criminal contempt sentence may not exceed six months in absence of jury trial); Fed.R.Crim.P. 42(b) (mandatory procedures for adjudicating contempt not committed in presence of court).

28. Shillitani v. United States, 384 U.S. 364, 371 n. 9, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 (1966).

criminal contempt results in a fixed sentence that the contemnor must serve regardless of whether he subsequently purges his contempt by complying with the District Court's order.[29] Consequently, the coercive element inherent in civil contempt is lost when resort is had to criminal contempt.

Another alternative remedy not suggested by Liddy [30] is the imposition of daily fines that would be assessed until Liddy agreed to testify before the grand jury. However, section 1826 provides no authority for assessment of coercive fines, so we have our doubts about whether the District Court would have the power to utilize such a remedy.[31] Moreover, the practicality of imposing coercive fines on Liddy, who is disabled by imprisonment from earning income

and who is already subject to a $40,000 fine for his Watergate convictions, is highly questionable.[32] Given the defects apparent in the alternative remedies of criminal contempt and coercive fines, we think the District Court acted properly in exercising its powers under 28 U.S.C. § 1826 and in effectuating that exercise by suspending execution of Liddy's sentence.

### III. PENDENCY OF AN APPEAL

The dissent argues that the District Court lacked jurisdiction to change appellant's sentence *in any way* once an appeal of that sentence had been perfected.[33] This absolutist view is to be distinguished from the more limited principle, which finds support in the case law,[34] that a trial court lacks jurisdiction

---

**29.** When confronted with a contumacious grand jury witness who was already imprisoned, the District Court in In re Reina, 170 F.Supp. 592 (S.D.N.Y.1959), sentenced the contemnor to two years' imprisonment to commence at the expiration of the sentence he was serving but allowed him 60 days from the date of judgment to purge himself of the contempt, in which case the two-year sentence would be vacated. Both the Second Circuit, 273 F.2d 234 (1959), and the Supreme Court, Reina v. United States, 364 U.S. 507, 81 S.Ct. 260, 5 L.Ed.2d 249 (1960), affirmed the contempt conviction and impliedly approved the District Court's "hybrid" sentencing technique. However, this technique was cast in doubt by the following comment by the Court in Shillitani v. United States, 384 U.S. 364, 370 n. 6, 86 S.Ct. 1531, 1536 (1966):

> The court may also impose a determinate sentence which includes a purge clause. This type of sentence would benefit an incorrigible witness. It raises none of the problems surrounding a judicial command that unless the witness testifies within a specified time he will be imprisoned for a term of years. See Reina v. United States, 364 U.S. 507 [81 S.Ct. 260, 5 L.Ed.2d 249] (1960).

The Court did not identify any specific "problems" inherent in the "hybrid" criminal contempt technique of *Reina*, but it may have been alluding to its holding that same day in Cheff v. Schnackenburg, 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966), that a contemnor may not be sentenced to more than six months' imprisonment for criminal contempt without a jury trial.

**30.** The Government raised this point in its brief at 10 n. 4.

**31.** No cases have been cited to us in which daily fines were employed in an attempt to coerce a contumacious witness into testifying. Fines are most frequently employed in civil suits to compel compliance with court orders, see Clark v. Boynton, 362 F.2d 992 (5th Cir. 1966), United States v. International Business Machines Corp., 60 F.R.D. 658 (S.D.N.Y.), appeal dismissed, 493 F.2d 112 (2nd Cir. 1973), or to compensate a complainant for losses sustained as a result of the contemnor's noncompliance, see Clark v. Boynton, *supra,* Parker v. United States, 153 F.2d 66 (1st Cir. 1946).

**32.** *See* United States v. United Mine Workers of America, 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947):

> [A] court which has returned a conviction for contempt must, in fixing the amount of a fine to be imposed as a punishment or as a means of securing future compliance, consider the amount of defendant's financial resources and the consequent seriousness of the burden to that particular defendant.

*See also* Moore v. United· States, 150 F.2d 323, 325 (10th Cir.), cert. denied, 326 U.S. 740, 66 S.Ct. 52, 90 L.Ed. 441 (1945).

**33.** This point was not raised in the brief or oral argument of appellant's counsel, but since our colleague has seen fit to raise a jurisdictional issue, we dispose of it herein.

**34.** The numerous cases relied on by our colleague are all expositions of the limited principle re: the term of a sentence.

to vacate or change the *term* of a sentence then on appeal. While we do not quarrel with this more limited rule, neither principle nor case law supports its extension to the facts of this case.

■ The limited rule is grounded upon the general principle that an appellate court is entitled at some point to a final decision from the trial court. This principle of finality is one of the factors underlying the final judgment rule in the federal system.[35] In the criminal context, it would certainly be unwise to permit the trial court to vacate or change the term of a sentence while the appellate court was wrestling with whether the defendant had been tried or sentenced in conformity with the law. However, changes in the *continuity* of a sentence do not similarly impinge upon the appellate function. If a defendant were to escape confinement or be placed on parole while his appeal was pending,[36] it is difficult to see any reason why an appeals court should not continue to determine the appeal. If the trial court determines that continuity of sentence should be disturbed in order to forward the policies underlying the civil contempt power, there is no possible disruption of appellate review of the original sentence. Rather, the imposition of civil contempt is reviewed, as we have done here, on separate appeal from that judgment.[37]

---

**35.** *See, e. g.,* 28 U.S.C. § 1291 (1970) which provides that the courts of appeal have jurisdiction of appeals from all final decisions of the district courts; 15 U.S.C. § 717r (1970) (Orders of the Federal Power Commission under the Natural Gas Act); 21 U.S.C. § 371 (1970) (Orders of the Secretary of Health, Education, and Welfare under the Federal Food, Drug, and Cosmetic Act).

**36.** Molinaro v. New Jersey, 396 U.S. 365, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970), is not to the contrary. In that case the Supreme Court dismissed the appeal of a defendant who had failed to surrender himself to state authorities and was thus considered a fugitive from justice. The language of the Court, in our view, makes clear that the dismissal was discretionary and not mandated by any loss of jurisdiction:

## IV. CONCLUSION

For the reasons stated herein, the action of the District Court is

Affirmed.

MacKINNON, Circuit Judge (dissenting):

The majority rules that when a prisoner serving a term of imprisonment appears before the sentencing court *on another matter,* that court has the power to resentence him, suspend execution of the first sentence, and order a distinct confinement for civil contempt based on an intervening refusal to testify in grand jury proceedings under a grant of immunity. In this case appellant had served eleven days of his sentence when the court interrupted its service and imposed a second, indeterminate sentence. The effect of the resentencing has been to postpone the expiration date of the first sentence for a period up to eighteen months. The majority opinion affirms the District Court's power to effect such an interruption, and sustains the action as a necessary means of protecting the court's integrity. I respectfully disagree with both conclusions. Moreover, it is pointed out that the trial court lost jurisdiction to modify the first sentence when appellant appealed that judgment to this court.

> While such an escape does not strip the case of its character as an adjudicable case or controversy, we believe it disentitles the defendant to call upon the resources of the Court for determination of his claims.

396 U.S. at 366, 90 S.Ct. at 498–499. The wrongful act of escape was the appellant's; his penalty was the refusal of the appellate court to hear his plea. Here a declination to exercise appellate jurisdiction would frustrate the contempt power of the District Court to the advantage of the contemnor.

**37.** Appellant's contempt judgment was affirmed on appeal in In re: Grand Jury Proceedings (George Gordon Liddy), 165 U.S.App. D.C. 254, 506 F.2d 1293, 1974.

## I. JUDICIAL POWER TO MODIFY SENTENCES OF IMPRISONMENT

The power of a court to interrupt one term of imprisonment in order to impose another sentence for civil contempt is a fertile field for judicial inquiry. A decision of the Arkansas Supreme Court, rendered almost sixty years ago, is the sole case on point. The majority opinion demonstrates that we are confronted with an open question, for it distinguishes the authority appellant advances, but offers none directly supporting its own position.[1] Thus our responsibility is to be sensitive to traditional notions of the limits of judicial power to modify prison sentences and historical conceptions of prisoners' rights. This sensitivity is lacking in the majority opinion; perusal of relevant cases and statutes leads me to an opposite conclusion.

Traditionally judicial power over prisoners and their sentences has been narrowly circumscribed. That commencement of execution of a sentence terminated a court's power to modify its order was a common, if not undisputed, precept. See, e. g., Commonwealth v. Foster, 122 Mass. 317, 23 Am.Rep. 326, 2 Am.Crim.Rep. 499 (1877); Brown v. Rice, 57 Me. 55, 2 Am.Rep. 11 (1869); Commonwealth v. Weymouth, 2 Allen (Mass.) 144, 79 Am.Dec. 776 (1861). Various decisions spoke of inherent limits on judicial power to suspend sentences, e. g., State v. Everett, 164 N.C. 399, 79 S.E. 274, 277 (N.C.1913); Re Jones, 35 Neb. 499, 53 N.W. 468 (1892); cf. Ex parte United States, 242 U.S. 27, 37 S.Ct. 72, 61 L.Ed. 129 (1916); of the dissipation of that power at the end of a term of court,

Commonwealth v. Foster, supra; cf. Basset v. United States, 76 U.S. (9 Wall.) 38, 19 L.Ed. 548 (1870), or after a prisoner is committed, e. g., People v. Meservey, 76 Mich. 223, 42 N.W. 1133 (1889); Re Jones, supra; see generally Annotation, 44 A.L.R. 1203; and of the right of a convicted defendant to proceed with service of his sentence without undue delay, e. g., Ex parte Ervin, 266 P.2d 984 (Okl.Cr.App.1954); Marks v. Wentworth, 199 Mass. 44, 85 N.E. 81 (1908); People ex rel. Boenert v. Barnett, 202 Ill. 287, 67 N.E. 23 (1903). A sentencing court has been denied the power to modify the terms of a prisoner's commitment in instances where the court sought to mitigate the effects of its judgment, as by reducing the period of confinement or decreeing a de facto parole. See State v. Hockett, 129 Mo.App. 639, 108 S.W. 599 (1907); Auldridge v. Womble, 157 Ga. 64, 120 S.E. 620 (1923); Commonwealth v. Mayloy, 57 Pa. 291 (1868); see generally Annotation, 141 A.L.R. 1225.

Cases which have addressed the distinct problem of interrupted or intermittent confinement have generally disallowed sentences fashioned toward that end. The language of State v. Buck, 120 Mo. 479, 25 S.W. 573, 578 (1894), is characteristic:

From the time of the conviction and sentence of defendant in the first case, he was, in legal contemplation, in a custody different from that of the circuit [trial] court, and could not be put upon his trial in another case until he had served out his time for which he had been sentenced in the first, or until the judgment and sentence in the first case had been set aside or re-

---

1. Despite the majority's conviction that cases such as Ex parte Lange, 85 U.S. (18 Wall.) 163, 21 L.Ed. 872 (1873), and United States v. Murray, 275 U.S. 347, 48 S.Ct. 146, 72 L.Ed. 309 (1928), are distinguishable from and thus inapposite to this case, it is difficult to distinguish away language as explicit as that used by Judge Sanborn in Egan v. United States, 268 F.2d 820, 823 (8th Cir. 1959):

   While a court may correct an illegal sentence at any time (Rule 35 of the Rules of Criminal Procedure, 18 U.S.C.A.), the begin-

ning of the service of the sentence in a criminal case ends the power of the court to change it. Ex parte Lange, 18 Wall. 163, 85 U.S. 163, 21 L.Ed. 872; United States v. Murray, 275 U.S. 347, 358, 48 S.Ct. 146, 72 L.Ed. 309. See and compare, Phillips v. United States, 8 Cir., 212 F.2d 327, 335, and Affronti v. United States, 350 U.S. 79, 83, 76 S.Ct. 171, 100 L.Ed. 62.

   Whatever its validity when first pronounced, a principle so often repeated and followed by federal courts, including the Supreme Court, cannot be ignored.

versed; until then it is to be deemed of full force and effect.

The Florida Supreme Court has held that "a convict has a right to pay his debt to society by one continuous period of imprisonment, to begin within a reasonable time after commitment." Sinclair v. State, 99 So.2d 238, 240 (Dist.Ct.App.Fla. 1957), citing Terrell v. Wiggins, 55 Fla. 596, 46 So. 727 (1908); State v. Horne, 52 Fla. 125, 42 So. 388 (1906). See also In re Jennings, 118 F. 479, 481 (C.C.E.D.Mo. 1902). These cases involved attempts to interrupt sentences which were continuous when imposed in order to take action on distinct indictments. The effort to design sentences to be served by periodic installment or to be imposed with reference to specified contingencies has similarly been disapproved. The court in State v. Bigelow, 76 Ariz. 13, 258 P.2d 409 (1953), invalidated a sentence of ninety days' confinement, to be served on certain days each week, on the ground that "[t]he superior courts of Arizona possess no inherent power to suspend the imposition or execution of sentences in any case." An almost identical sentence was disallowed in Ex parte Taylor, 140 Cal.App. 102, 34 P.2d 1036 (1934), for the reason that the applicable probation statute provided the exclusive means of suspending sentences. See also Chase v. State, 479 P. 2d 337 (Ala.1971); Ex parte Emmons, 96 Okl.Cr. 396, 256 P.2d 476 (1953); People v. Felker, 61 Mich. 110, 27 N.W. 869 (1886). That this principle has vitality in the federal sphere is evidenced by the unequivocal language of Lanier v. Williams, 361 F.Supp. 944, 947 (E.D.N.C.1973): "It is settled that a person, duly convicted of a criminal offense and upon whom a sentence of imprisonment is imposed, has a right to serve that sentence promptly and continuously, and he cannot be required to serve his sentence in installments."

Finally, the sole case on point warrants attention. The Arkansas Supreme Court addressed the problem which confronts us in 1916 in Williams v. State, 125 Ark. 287, 188 S.W. 826. The court acknowledged that a convict could be brought into court and compelled to testify, and that he could be punished for his contumacy if he refused, but it specifically held that an intervening sentence to confinement which interrupted service of his initial term was an impermissible punishment for contempt. Because the facts in Williams and in this case are identical, the court's reasoning bears scrutiny.

> We pass . . . to the more serious question whether or not the court had the power to set aside the former judgment of conviction of felony, which judgment was then being enforced, for the purpose of imposing punishment for contempt and enforcing the judgment. While the question is not entirely free from doubt, we are of the opinion that the court possessed no such power. The Attorney General relies upon the established doctrine that all courts have continuing powers over their own judgments during the terms at which they are rendered; but while that power is an undoubted one, there are limitations upon the extent to which it may be exercised. . . . Here we have a case of the court attempting to set aside a judgment, not before the term of the sentence was begun, nor for the purpose of correcting any errors, but merely for the purpose of imposing another sentence during the period or the suspension of the judgment.
>
> . . . The law takes no account of parts of a term of sentence, which continues from beginning to end as one term. Therefore the court was without power to separate it into parts for the purpose of giving time to punish for other offenses.

125 Ark. at 288, 188 S.W. at 827 (emphasis added). The authority furnished by this solitary decision is scant, but the case is significant as a reflection of the contemporary view of judicial power to modify sentences. The majority's perspective is that prison sentences have

but one significant characteristic: duration. *Williams, Lanier* and the Florida cases, *supra,* all suggest the existence of another, perhaps equally important feature: continuity. Respect for the unity of a term of imprisonment does not deny a judge the power to punish for contempt a prisoner who refuses to testify. On the contrary, the *Williams* court explicitly notes that a "punishment by confinement in the county jail might have been imposed to run after the expiration of [the] other sentence." But the premise of *Williams*—that power to effect delays in the service of a sentence passes once commitment occurs—is not consonant with the result the majority affirms here.

We should be mindful of, but not necessarily wedded to, this traditionally narrow conception of judicial power to modify the terms of a sentence of imprisonment which has been reduced to judgment. These early formulations have been succeeded by the passage of statutes and the adoption of rules governing the computation and correction of sentences to confinement. The majority in this case reads these more recent provisions without reference to their common law antecedents, and by its result the majority suggests that this decisional background has been rejected. On the contrary, precisely because Federal Rule of Criminal Procedure 35, providing for the correction and reduction of sentences, and 18 U.S.C. § 3568, defining the computation of time served under prison sentences, can be read in harmony with earlier decisions limiting a court's power to alter sentences to imprisonment, that reading should be adopted.

## II. RULE 35 AND MODIFICATION OF SENTENCE

Federal Rule of Criminal Procedure 35 provides:

### Correction or Reduction of Sentence

The court may correct an illegal sentence at any time and may correct a sentence imposed in an illegal manner within the time provided herein for the reduction of sentence. The court may reduce a sentence within 120 days after the sentence is imposed, or within 120 days after receipt by the court of a mandate issued upon affirmance of the judgment or dismissal of the appeal, or within 120 days after entry of any order or judgment of the Supreme Court denying review of, or having the effect of upholding, a judgment of conviction. The court may also reduce a sentence upon revocation of probation as provided by law.

As amended Feb. 28, 1966, eff. July 1, 1966.

The purpose of this rule was set forth in a note accompanying promulgation of its antecedent, Rule 31(b), in 1946:

The limitation on the time for reduction of sentence is designed to extend the power of the judge to reduce a sentence imposed after a trial held near the end of a term, and on the other hand to put a limit on the reduction of sentence in a protracted or specially extended term of court or in the absence of fixed terms of court.

Federal Rules of Criminal Procedure, Preliminary Draft 135 (1943). The time period for correction, increased from 60 to 120 days in 1966, fixed a court's power to modify its sentences in the absence of the concept of "term of court." The rule provided a new measure of a power which had always had a clearly defined boundary. A function, and presumably a purpose of this limitation on the power to reduce sentences, is the definition of a point beyond which a prisoner may rely on the terms of his sentence as it has been imposed. The court in Commonwealth v. Mayloy, *supra,* speaking not of the rule but of the common law limitation by court term, cited one salutary aspect of irreducible sentences: they prevent a prisoner from indulging in false hopes of an early pardon. Whatever the ancillary purposes of the limitation may be, because it will almost never

serve the interests of a prisoner, and because it may well impede a trial court's search for the fairest result in a given case, its codification in Rule 35 must in large part be premised on the notion that at some point a sentencing court must relinquish power over a sentence it has imposed. This persistent concept of limited power to modify sentences, coupled with the adoption of specific rules to permit such modification in certain circumstances, carries a clear implication which somehow escapes the majority: If specific authority is required for modification which *reduces* a prisoner's sentence, it must certainly be necessary for other substantial variations in the terms of a sentence.

### III.   18 U.S.C. § 3568

18 U.S.C. § 3568 (1970) provides:

The sentence of imprisonment of any person convicted of an offense shall commence to run from the date on which such person is received at the penitentiary, reformatory, or jail for service of such sentence. The Attorney General shall give any such person credit toward service of his sentence for any days spent in custody in connection with the offense or acts for which sentence was imposed.

. . . . .

No sentence shall prescribe any other method of computing the term.

Perusal of the legislative history behind this section has convinced the majority that it is inapposite to Liddy's situation. They complain that appellant is giving the statute a literal interpretation; but from 2 Dallas (1781) to the present day there has been no breach in the requirement that laws relating to criminal conduct should generally be strictly construed. Respublica v. Weidle, 2 Dall. 88 (Pa.Sup.Ct.1781); United States v. Baltimore & O. S. W. R. Co., 222 U.S. 8, 13,

32 S.Ct. 6, 56 L.Ed. 68 (1911); United States v. Halseth, 342 U.S. 277, 280, 72 S.Ct. 275, 96 L.Ed. 308 (1952). The majority also assert that their conclusion is supported by the fact that the statute is designed, in the words of the House and Senate Reports, to "produce certainty and prevent juggling with sentences in the way described". The reports speak specifically of irregular methods of fixing the starting date of a prison term, and thus the section's closing sentence, excluding all conflicting methods of computing time served, literally pertains only to the fixing of starting dates for sentences.

Read more broadly, the statute is a manifestation of a legislative purpose that individuals sentenced to imprisonment shall not be denied the opportunity to commence service of their terms by administrative delay or preliminary confinement. To this end it is in accord with considerable case law ordering prompt delivery to prison authorities of one sentenced to confinement, *see, e. g.,* O'Neil v. State, 134 Ala. 189, 32 So. 667 (1902); State v. Couture, 156 Me. 231, 163 A.2d 646 (1960); Ex parte Ervin, 266 P.2d 984 (Okl.Cr.App.1954), and prohibiting unnecessary delay in the imposition of sentence, *e. g.,* Juarez-Casares v. United States, 496 F.2d 190, 192 (5th Cir. 1974); United States v. Grabina, 309 F.2d 783, 786 (2d Cir. 1962); People ex rel. Harty v. Fay, 10 N.Y.2d 374, 223 N.Y.S.2d 468, 179 N.E.2d 483 (1961); People v. Kennedy, 58 Mich. 372, 25 N.W. 318 (1885). The preponderance of these cases share one of the premises [2] of that portion of section 3568 which gives credit for preliminary incarceration: that an individual convicted of a crime should be able to pay the penalty promptly. Yet the majority finds that this statute, which prohibits any unnecessary hiatus between sentencing and the start of service, is irrelevant to the issue of judicial power to effect an even more disruptive delay once service of

---

**2.** The statute has another premise which is equally germane to this case: once sentence is imposed, incarceration should be credited toward service of the sentence.

sentence has already commenced. If juggling of sentences is to be prohibited before commitment occurs, it is even more offensive once a term of imprisonment has begun. To ascribe to Congress the intent to proscribe juggling tactics *before* service of a sentence commences, but not the intent to prohibit the same practices after the sentence has begun to run, is to reduce its legislation to a virtual nullity.

As the majority states,[3] *one* of the objectives of the legislation was to "remove confusion" in calculating the time a prisoner has served on his sentence.[4] Congress indicated that section 3568 was intended, *inter alia,* to "produce certainty and prevent juggling with sentences in the way described"[5]—announcing spurious dates of commitment in order to advance the date of parole eligibility or augment good conduct deductions—but Congress also noted that "various other instances of confusion" had prompted passage of the statute.[6] It is plain that indefinite suspension of a sentence already commenced (with an 18-month maximum) will engender similar confusion: each situation causes uncertainty as to parole and good conduct credit for a period of non-confinement on the sentence originally adjudged. In fact interruption of a sentence for an indefinite period might produce greater confusion than juggling the starting date, for the actual terms of the sentence would not be fully determinable from its provisions.

## IV. THE CONSTITUTIONAL FOUNDATION FOR DENYING INTERRUPTION OF SERVICE

The Double Jeopardy Clause of the Fifth Amendment specifically addresses and proscribes the practice of subjecting an individual to two different trials for a single crime.[7]

> \* \* \* nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; \* \*

The Supreme Court has extrapolated from this language a prohibition against double punishment, on the theory that the imposition of two penalties for the same offense poses as great a threat to a defendant as the convening of two trials. Ex parte Lange, 85 U.S. (18 Wall.) 163, 21 L.Ed. 872 (1874); *see also* Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 462, 67 S.Ct. 374, 91 L.Ed. 422 (1947); Patton v. State of North Carolina, 381 F.2d 636, 643–645 (4th Cir. 1967). And the Court has developed the principle that resentencing which augments a sentence previously imposed and partially suffered also violates the Double Jeopardy Clause. United States v. Benz, 282 U.S. 304, 51 S.Ct. 113, 75 L.Ed. 354 (1931); Ex parte Lange, *supra; see also* Wilson v. Bell, 137 F.2d 716, 720 (6th Cir. 1943); Rowley v. Welch, 72 App.D.C. 351, 114 F.2d 499 (1940). Thus if interruption of appellant's sentence and his intervening incarceration serve to increase the penalty he must suffer for his first conviction, the action is constitutionally invalid.

No reported decision has determined whether an interruption in the service of a sentence constitutes an increased punishment. But factors cited as unnecessarily onerous incidents of the criminal process in other contexts are relevant to this determination. The Supreme Court has spoken of the "cloud of anxiety" which hangs over an individual between indictment and trial. Barker v. Wingo, 407 U.S. 514, 532, 533, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), *citing* United States v. Ewell, 383 U.S. 116, 120, 86 S.Ct. 773,

---

**3.** Majority Op. at 674.

**4.** S.Rep.No.803, 72nd Cong., 1st Sess. 2 (1932); H.R.Rep.No.960, 72nd Cong., 1st Sess. 2 (1932).

**5.** *Id.*

**6.** *Id.*

**7.** *See* Price v. Georgia, 398 U.S. 323, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970); Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); Green v. United States, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957).

15 L.Ed.2d 627 (1966); Smith v. Hooey, 393 U.S. 374, 377–378, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969); Klopfer v. North Carolina, 386 U.S. 213, 221–222, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). The anxiety which accompanies an unserved prison sentence is no less burdensome. Until his term is completed, a prisoner is subject to at least the same suspicion, hostility and stigma which a defendant released on bail experiences. Of course troubled soul-searching is a salutary and desirable aspect of imprisonment, but it should be an incident of confinement for the offense, not an incremental penalty incident to a delay in the execution of the sentence for an indeterminate period. The majority's single-minded concern with the duration of appellant's sentence obscures the fact that he must now wait eighteen months more before that sentence expires. Throughout the hiatus in his term he will suffer the same anxiety and bear the same stigma he experienced when he was confined under his original sentence, and which he will experience when he begins to serve it once again. Thus, by extending the expiration date of the original sentence, by interrupting its service for 18 months, punishment has been imposed on him which was not part of the trial court's first sentence. Time is the stuff that life is made of and the additional 18 months of anxiety, anguish and delay is increased punishment.

Postponement of the expiration date of a sentence, if effected by a short delay in the commencement of service, is not inherently prejudicial and does not ordinarily justify reduction of the term or credit for the delay. See generally Anderson v. Corall, 263 U.S. 193, 196, 44 S.Ct. 43, 68 L.Ed. 247 (1923); Pinkerton v. Steele, 181 F.2d 536 (8th Cir. 1950);

Woods v. Steiner, 207 F.Supp. 945, 953 (D.Md.1962); United States ex rel. Binion v. United States Marshal for the District of Nevada, 188 F.Supp. 905, 908 (D.Nev.1960). Like any statement of administrative latitude, this rule has exceptions; substantial and unjustified delay in the execution of a sentence has often been held to preclude its enforcement or warrant reduction in its terms. See, e. g., Smith v. Swope, 91 F.2d 260, 262 (9th Cir. 1937) ("The least to which a prisoner is entitled is the execution of the sentence to whose judgment he is duly subject."); State ex rel. Shotkin v. Buchanan, 149 So.2d 574 (Dist.Ct.App.Fla.1963); Ex parte Bugg, 163 Mo.App. 44, 145 S.W. 831 (1912). Mitigation of the prejudicial effects of precommitment delay was one of the essential purposes behind passage of the 1966 amendment to 18 U.S.C. § 3568.[8] If undue delay in the commencement of service can be an incremental penalty, it follows a fortiori that delay caused by interruption of service can have the same effect. To hold that a sentence need not be continuous is to admit the possibility of manifold interruptions compounding a prisoner's anxiety, thwarting efforts at rehabilitation, and postponing the expiration date of the sentence indefinitely. This sort of juggling of terms is even more insidious than the abuses to which the majority finds section 3568 was addressed. Because in almost every foreseeable circumstance an interrupted sentence will be perceptibly more severe, interruption violates the Double Jeopardy Clause under the principles laid down in Benz and Lange, supra.

This constitutional prohibition against interruption of sentences may in turn yield exceptions. The majority cites the established "fault of the prisoner" excep-

---

8. The Second Circuit outlined the purpose of the amendment in Siegel v. United States, 436 F.2d 92 (1970):

. . . The legislative history of this Amendment clearly reveals that it was intended to confer credit for time spent in federal custody by a prisoner to prevent a judge from frustrating the will of Congress

by adding a comparable period to that served while awaiting sentence to the sentence itself; . . . . Section 3568 merely allows credit for all of the time that a prisoner is deprived of while held in custody in connection with the "offenses or acts" on which he was sentenced.

436 F.2d at 95.

tion as justification for interrupting appellant's term, but a closer analysis of relevant case law indicates that it is inapplicable to this situation. The leading decision is McDonald v. Lee,[9] where the Fifth Circuit held:

> At common law a prisoner has a right to serve his sentence continuously, and cannot be required to serve it in installments, but even at common law a continuous sentence may be interrupted by some fault of the prisoner.

The majority reasons that appellant's "intentional acts" place him in a position similar to that of an escapee or a parolee who commits offenses which lead to revocation of his parole. Even those do not authorize a *sentencing court* to change the sentence originally imposed on the initial offense.[10] But appellant's fault is of a different order from an escape or parole violation. His refusal to testify before the grand jury does not come within the McDonald v. Lee exception because it is not the fault of a prisoner *qua* prisoner; rather, it is an act totally extraneous to his imprisonment. In contrast to the other transgressions cited by the majority, appellant's refusal to testify does not evince any intent to avoid or terminate service of his sentence. Moreover, his silence before the grand jury is an "intentional act" only in an oblique and technical sense. Appellant displayed every intention of serving his term promptly and continuously; any argument that he wilfully interrupted his sentence is sophistical.

We need not determine at this juncture whether circumstances may ever arise which justify interruption of a prison term. It might be argued that the constitutional invalidity of interrupted sentences does not admit exceptions. Because the prisoner bears sole responsibility for the interruption in the situations cited by the majority—escape and parole violation—the constitutional issue is not raised. In circumstances requiring immediate suspension of one sentence and imposition of a new penalty—for example, commission of a capital offense in prison; of a major offense by one in jail for a misdemeanor; or of a crime requiring adult treatment, by one incarcerated under the Youth Corrections Act—the remainder of the initial sentence would probably be vacated or served concurrently. On the other hand there may be extreme situations which justify exceptions to this general rule. In this case, however, we need only rule that the District Court had no justifiable reason to interrupt appellant's sentence.

## V. THE DISTRICT COURT'S ALTERNATIVES

The District Court and the majority both justify interruption of appellant's sentence on the ground that it is essential to give effect to the coercive sanction of civil contempt. The majority proceeds to discount the alternatives of criminal contempt and daily fines. But the District Court in fact availed itself of one of several alternative methods

---

**9.** 217 F.2d 619, 623 (5th Cir. 1954), vacated as moot, 349 U.S. 948, 75 S.Ct. 893, 99 L.Ed. 1274 (1955). *See also* White v. Pearlman, 42 F.2d 788, 789 (10th Cir. 1930), where the court asserted:

> A prisoner has some rights. A sentence of five years means a continuous sentence, unless interrupted by escape, violation of parole, or some fault of the prisoner, and he cannot be required to serve it in installments. Certainly a prisoner should have his chance to re-establish himself and live down his past.

**10.** That sentence remains unchanged and all that results is the prison authorities apply the

well established law that the period of escape is not credited as time served. An escaped prisoner, or one who breached his parole, is not brought back to the sentencing court for any action with respect to his original sentence. He may be indicted and tried for escape but the locale of such trial would be determined by the location of the prison. This may or may not be within the jurisdiction of the court imposing the original sentence and even if it were, a different judge might preside at such trial. For breach of parole, the Board of Parole acts.

that might have been used to induce appellant to testify when it imposed sentence on Hunt and the four former Cuban residents (hereafter referred to as the Cubans).

On the day appellant was sentenced his five co-defendants (Hunt and the four Cubans) received maximum terms of imprisonment under 18 U.S.C. § 4208(b) pending the completion of a Bureau of Prisons study of each of the five men under that statute, to be used in arriving at a final disposition of each case. The court noted that in each instance it could either affirm the maximum sentence, reduce it, or place the defendant on probation. Almost in the same breath the court encouraged each man to "give serious consideration to lending [his] full cooperation to investigating authorities." [11] The five then listened to an extensive quotation from a statement made by Judge Ferguson of the Central District of California as he accepted guilty pleas and imposed sentences in a case involving fraud and corruption in the operation of United States military clubs in Europe, Vietnam and the United States.

> . . . I am making no promise of leniency—but the sentence I impose will depend primarily on whether or not you cooperate with the permanent subcommittee on investigation of the United States Senate and if you are asked to testify and give evidence before that permanent subcommittee and if you testify openly and completely, regardless of what the implications are to yourself or to anyone else or to the system so that the branch of the Government which can take corrective action of the system is able to take action on the system so that this activity simply does not occur again, then I will take that into consideration because I want to see something beneficial to the Government come out of these proceedings.[12]

The trial court then spoke directly to the five defendants.

> For these reasons I recommend your full cooperation with the Grand Jury and the Senate Select Committee. You must understand that I hold out no promise or hopes of any kind to you in this matter but I do say that should you decide to speak freely I would have to weigh that factor in appraising what sentence will be finally imposed in this case.[13]

Liddy was in court throughout this sentencing of Hunt and the Cubans. The court's import was plain: these five co-defendants of appellant would likely serve longer sentences for future refusals to testify. Unquestionably the trial court's remarks in sentencing the five co-defendants constituted the same order of coercion as was imposed upon appellant by the civil contempt sanction.

The trial court could have used the same sentencing technique on appellant and it had other alternative means of impelling appellant to purge himself without interrupting his sentence. The court could have suspended the imposition of a consecutive sentence and placed appellant on probation for eighteen months or some lesser period conditioned on appellant's cooperation. Or it could have imposed an eighteen-month consecutive sentence and announced that it would consider reduction of the sentence within the time limits authorized by Rule 35. Finally, the trial court could simply have waited until after the defendant had appeared before the grand jury before it imposed sentence. In effect the court followed this last approach when it sentenced appellant's co-defendants by indicating that the decision to testify freely would be a prime basis for determination of sentences upon completion of the Bureau of Prisons study. Although those alternative sentencing techniques might have been equally un-

---

11. Sentencing transcript at 36.

12. *Id.* at 39.

13. *Id.* at 40.

successful, they would have had the same coercive effect as confinement for civil contempt, and because they would not have interrupted appellant's service of his sentence, they should have been favored. If circumstances do exist which justify interruption of a sentence, this case clearly does not present them.

## VI. SUMMARY

In justifying the District Court's action the majority has embraced an unreasonably narrow conception of criminal punishment. The continuity of a term of imprisonment may be as significant as its duration. Common sense dictates that a one-year sentence cannot be subdivided and required to be served a single day each year, though the effect would be to reduce the number of days spent in confinement. This principle of the unity of a prison sentence is not born only of reasonableness, but has roots in decisional, statutory and constitutional law which make it binding on this court. We have ample evidence of a legislative and judicial commitment that a convicted defendant shall be allowed to pay his debt promptly and continuously, in order that he not be subjected to a penalty greater than that authorized by statute. Before service of a sentence can legitimately be interrupted, some more convincing showing of necessity must be made than the one advanced here.

14. In *Mack* this court used what might be regarded as somewhat tentative language: "As a general rule, a district court's authority to take further action in a case is severely limited by the noting of an appeal." The paucity of exceptions to this rule is significant. The authority the *Mack* court cited for the proposition, "9 J. Moore, Federal Practice, ¶ 203.11 at 734–40, and cases cited therein," includes only one criminal citation, Euziere v. United States, 266 F.2d 88 (10th Cir. 1959), vacated on other grounds, 364 U.S. 282, 80 S.Ct. 1615, 4 L.Ed.2d 1720 (1960). That case states "all of the cases hold that an appeal divests the trial court of jurisdiction over the case" and requires only that a valid appeal be taken from an appealable order before trial court jurisdiction is terminated. 266 F.2d at 91. Neither the text in Moore nor any of its citations suggest a relevant exception to the

## VII. THE PENDENCY OF APPEAL

While the majority may disagree with the preceding analysis of judicial power to interrupt sentences, prior decisions of this court, of other circuits, and of the Supreme Court all indicate that the District Court *lacked jurisdiction* to modify appellant's sentence once he lodged his appeal with this court.

The final judgment in a criminal case is the sentence. Berman v. United States, 302 U.S. 211, 212, 58 S.Ct. 164, 82 L.Ed. 204 (1937); Hill v. Wampler, 298 U.S. 460, 464, 56 S.Ct. 760, 80 L.Ed. 1283 (1936); Miller v. Aderhold, 288 U.S. 206, 210, 53 S.Ct. 325, 288 U.S. 206 (1933). Thus appeal of the judgment is appeal of the sentence imposed. Once appeal is properly taken, the District Court is without jurisdiction during its pendency to modify the judgment by resentencing the prisoner. Berman v. United States, 302 U.S. at 214, 58 S.Ct. 164; Keyser v. Farr, 105 U.S. 265, 266, 26 L.Ed. 1025 (1882). A unanimous panel of this court has held that a "District Court . . . was without authority to vacate the general sentence previously imposed" once notice of appeal was filed, United States v. Mack, 151 U.S.App.D.C. 162, 169, 466 F.2d 333, 340 (1972).[14] There the pendency of appeal was held to terminate the District Court's power to correct an illegal general sentence in the face of explicit language in Rule 35 allowing such

rule that noting of an appeal ends the power of the district court over its judgment; on the contrary, all of the authority supports the general principle that "jurisdiction . . . with respect to any matters involved in the appeal" passes immediately to the court of appeals, Moore, *supra* at 734.

Relying on the statement that District Court jurisdiction is "severely limited," but not concluded, by the noting of an appeal, the court in *Mack* suggested that an exception might be created, as for the correction of an illegal sentence, a procedure specifically allowed by the language of Rule 35. The fact that the court chose not to recognize such an exception argues in favor of continued strict adherence to the general rule, in the interest of "an orderly appellate process." 466 F.2d at 340.

correction "at any time," on the theory that the rule extended the power of the trial court beyond the expiration of the term during which sentence was imposed, but could not sustain that power once jurisdiction passed to the appellate court.[15] *Cf.* Smith v. Pollin, 90 U.S.App. D.C. 178, 180, 194 F.2d 349, 350 (1952). The Second Circuit has similarly held that a trial court is without power to change a sentence once appeal is perfected, United States v. Grabina, 309 F.2d 783, 785 (1962), and has emphasized that appeal deprives the trial court of "jurisdiction" and "power" to make "further orders in the appealed cause" whether the intended modification be the granting of probation or the reduction or correction of sentence, United States v. Ellenbogen, 390 F.2d 537, 542 (1968). *See also* United States v. Habib, 72 F.2d 271 (2d Cir. 1934); Spirou v. United States, 24 F.2d 796 (2d Cir.), cert. denied, 277 U.S. 596, 48 S.Ct. 559, 72 L.Ed. 1006 (1928); United States v. Tuffanelli, 138 F.2d 981, 983 (7th Cir. 1943) ("the trial court on appeal lost all jurisdiction of the case, and any power or authority to resentence must have been by virtue of [an appellate court] mandate.").

It remains only to apply this jurisdictional principle to the facts of appellant's case. He was sentenced on March 23, 1973, and filed a notice of appeal on March 26, well within the ten-day period prescribed by appellate rule 4.[16] The

15. This court's decision in Womack v. United States, 129 U.S.App.D.C. 427, 395 F.2d 630 (1968), is not to the contrary. That case holds that "there is no jurisdictional bar to the District Court's entertaining a Section 2255 motion during the pendency of a direct appeal," but indicates that "[w]here the District Judge concludes that the motion is or may be appropriate, he may follow the procedure outlined in Smith v. Pollin," *supra*, that is, move the Court of Appeals for a remand. *In fact, because Womack* requires "extraordinary circumstances" even for this procedure, it reinforces the proposition that jurisdiction and plenary power rest in the appellate court once appeal is noted.

16. Appellant's Notice of Appeal is reproduced below:

### NOTICE OF APPEAL

[Filed Mar 26, 1973, James F. Davey, Clerk]

Name and address of appellant
   George Gordon Liddy
   9310 Ivanhoe Road
   Oxen [*sic*] Hill, Maryland

Name and address of appellant's attorney
   Peter L. Maroulis              Thomas A. Kennelly
   11 Cannon Street              1819 H Street, N.W.
   Poughkeepsie, New York       Washington, D.C.

Offense
   18 U.S.C. Sec. 371;  22 D.C.Code, Sec. 1801(b) (2 counts);  18 U.S.C. Sec. 2511 (3 counts).

Concise statement of judgment or order, giving date, and any statement
   Judgment of the U. S. District Court, District of Columbia, per Chief Judge John J. Sirica, dated and filed March 23, 1973. Sentence: Count 1, 20 mos-5 yrs & $10,000 fine; Count 2, 5 yrs-15 yrs; Count 3, 5 yrs-15 yrs; Count 4, 20 mos-5 yrs & $10,000 fine; Count 5, 20 mos-5 yrs & $10,000 fine; Count 8, 20 mos-5 yrs & $10,000 fine. Counts 1, 2 and 3 concurrent with each other; Counts 4, 5 and 8 concurrent with each other and consecutive to Counts 1, 2 and 3.

same day he appealed his conviction appellant was called before the grand jury, and that same day the government sought immunity for his testimony under 18 U.S.C. §§ 6001–6003. At a hearing on March 30, the trial judge granted the government's motion, and appellant persisted in his refusal to testify. On April 3, 1973, the trial court granted a government motion that appellant be adjudged in civil contempt for his refusal to testify. The court *sua sponte* ordered that execution of appellant's prison sentence be held in abeyance during his confinement for contempt in the District of Columbia jail.[17] *At that time the case was in the Court of Appeals and the trial court was without jurisdiction over appellant's sentence and wholly powerless to suspend its execution.*

In part III of its opinion, "Pendency of Appeal," the majority asserts that this claim of lack of jurisdiction in the trial court is an absolutist concept—but jurisdiction is like that. It can be absolute or nonexistent. Significantly, the majority does not cite any authority to support its claim that trial court jurisdiction existed.[18] And the opinion wholly ignores the fact that we are concerned not with policy but with the rule stated in Berman v. United States, *supra*, 302 U.S.

at 214, 58 S.Ct. 164, that "the District Court [is] without jurisdiction during the pendency of [an] appeal to modify its judgment by resentencing the prisoner. Draper v. Davis, 102 U.S. 370, 371, [26 L.Ed. 121]; Keyser v. Farr, 105 U.S. 265, 266 [26 L.Ed. 1025]; Spirou v. United States, 24 F.2d 796, 797; United States v. Radice, 40 F.2d 445, 446; United States v. Habib, 72 F.2d 271."

In United States v. Mack, *supra*, in an opinion written by Chief Judge Soboloff of the Fourth Circuit, with Chief Judge Bazelon and Judge Leventhal participating, this court held that "the District Court once [appellant] filed his notice of appeal, was without authority to vacate the general sentence previously imposed." 466 F.2d at 340. That decision held that the noting of appeal divested the District Court of jurisdiction to correct an illegal sentence; *a fortiori* a trial court has no jurisdiction or power to change a valid sentence.

Appellant's service of his sentence is without legal effect. Because he has remained incarcerated since his initial commitment, he is entitled to full credit on that first sentence for all time served, and the second sentence is a nullity insofar as it interrupts the first sentence.[19]

Name of institution where now confined, if not on bail
District of Columbia Jail

I, the above-named appellant, hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the above-stated judgment.

Date: March 26, 1973

/s/ Peter L. Maroulis
Attorney for Appellant

/s/ Thomas A. Kennelly
Attorney for Appellant

---

17. To give meaning and coercive impact to the Court's contempt powers in the interest of protecting the Court's integrity, the Court here finds it necessary to hold in abeyance the execution of Mr. Liddy's sentence under the indictment pending his confinement for contempt.

Defendant's Appendix 22–23.

18. *See* footnote 34 of majority opinion *supra.*

19. The majority opinion also states, "If a defendant were to escape confinement . . . while his appeal was pending, it is difficult to see any reason why an appeals court should not continue to determine the appeal." Majority opinion at 677. Confronted with that situation, the Supreme Court has dismissed

the appeal. Molinaro v. New Jersey, 396 U.S.
365, 366, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970);
Bohanan v. Nebraska, 125 U.S. 692, 8 S.Ct.
1390, 30 L.Ed. 71 (1887); Smith v. United
States, 94 U.S. 97, 24 L.Ed. 32 (1876). These
decisions indicate that, contrary to the major-
ity's position, "changes in the continuity of a
sentence" do in fact "impinge upon the appel-
late function." But the relevancy of the ma-
jority's argument is remote at best: we are
not concerned here with the practicality of
proceeding with an appeal once an unavoida-

ble or legitimate interruption of sentence has
occurred, but rather with the validity of trial
court action causing that interruption.

As for the majority's other example of a
discontinuity of sentence, the decision of the
Parole Board to place a prisoner on parole
while his appeal is pending is completely ir-
relevant to any issue presented here. Such
power is implicit in every prison sentence
and the exercise of that power by the Board
of Parole does not change the sentence.